RICHARD ABELES AND JACK I. LEVKOFF, PLAINTIFFS-
APPELLANTS, v. ADAMS ENGINEERING CO., INC.,
DEFENDANT-RESPONDENT.

Argued May 9, 1961—Decided June 30, 1961.

*Mr. Howard T. Rosen* argued the cause for plaintiffs-appellants (*Messrs. Jacob and Martin S. Fox,* attorneys).

*Mr. Herbert D. Kelleher* argued the cause for defendant-respondent (*Messrs. Lum, Biunno & Tompkins,* attorneys; *Mr. William A. Wachenfeld* and *Mr. Saul G. Schuller,* of counsel).

The opinion of the court was delivered by

FRANCIS, J. The Superior Court, Law Division, after a non-jury trial, entered a judgment of $69,500 in favor of plaintiff, Richard Abeles, as a broker's commission for obtaining a lender, ready, willing and able to make a substantial institutional loan to defendant. The Appellate Division reversed. 64 *N. J. Super.* 167 (1960). We granted certification. 34 *N. J.* 327 (1961).

Abeles sued as assignee of a written brokerage agreement executed by the president of defendant corporation. Although Abeles was not named in the agreement, he was, to the knowledge of defendant, an active participant and an important factor in producing the lender. The plaintiff Levkoff was also an active participating broker and joined in the suit as such. But he was neither a party to defendant's written authorization nor to the assignment. Consequently the trial judge dismissed the action as to him. He did not appeal.

Defendant, Adams Engineering Co., Inc., is a Florida corporation with its principal office in Miami. Charles Silvers is the president and (as defendant says in its brief) as such manages its affairs. He and his family own approximately 89% of the outstanding stock, although the record does not reveal how many shares Silvers owns personally. Adams Engineering Co. was incorporated in 1952 and its initial public offering of stock was underwritten by Atwill & Company. Some time later William Atwill, Jr. became a member of defendant's board of directors and of the finance committee of that board. Atwill's corporation (which is wholly owned by him) is engaged in the investment banking business. His company acts as broker in financial transactions, including the buying and selling of

stocks and bonds; it engages in the underwriting of securities for corporations. Atwill acts as financial advisor to various municipalities in Florida, and he is also a general partner in the Wall Street firm of A. C. Allyn & Co.

While Atwill was serving on the board of directors and its finance committee, defendant became interested in long-term corporate financing. The matter was discussed a number of times at directors' meetings when Atwill was present. According to Silvers, "We had directors' meetings and he was asked many times to get money." In the spring of 1957 Atwill asked Silvers if Adams Engineering Co., Inc. (Adams) was interested in an institutional loan, and after an affirmative answer some discussion ensued regarding a loan of that type. There can be no reasonable doubt that Atwill was told by Silvers to explore the possibility of such a loan.

Atwill communicated with Levkoff, a Miami, Florida mortgage broker, who, he had learned, had been successful in negotiating substantial loans with insurance companies. After some conversation about the problem, Atwill provided financial statements of Adams. Levkoff studied them, apparently was favorably impressed and so informed Atwill. Levkoff got in touch with Abeles, a Newark, New Jersey broker with whom he had been associated in the placing of mortgages, and explained the situation to him. Abeles advised that the Prudential Insurance Company made that kind of loan, and thereafter they both busied themselves with the problem. Abeles drew a credit report on Adams and then took the matter up with Prudential representatives in Newark. He succeeded in interesting them—a constructive accomplishment because in 1954 Prudential had refused a loan to Adams—and the associate investment manager of the Newark office directed Donald R. Knab, Investment Manager of the Prudential Florida office, to look into the subject "because he felt it would pay interest at this time." As a result, a meeting was arranged for July 2, 1957 at defendant's office in Miami. Present were Silvers, Abeles,

Levkoff, Atwill and two representatives of the Prudential, Knab and Hall. The loan was discussed generally, as well as the financial condition and business operations of Adams. At this time Knab mentioned that his company might require life insurance written by any good insurer to safeguard the loan. In any event, the general atmosphere was favorable and it was understood the Prudential people would enter into a thorough study of the prospect.

Meanwhile, following discussion among Atwill, Levkoff and Abeles, Atwill informed Silvers that the brokerage fee would be 6% of the amount of any loan, each of the three participating brokers to receive 2%. Silvers at first expressed the view that the fee was too high but then agreed, apparently on condition that it cover the costs incidental to closing. Shortly thereafter the following letter was written on the letterhead of Adams Engineering Co., Inc.:

"August 9, 1957

Mr. William Atwill, Jr.
Atwill & Company
605 Lincoln Road
Miami Beach, Florida.

Dear Mr. Atwill:—

This will confirm our telephone conversation of Wednesday, August 7, 1957. '

If you are successful in concluding a fifteen-year institutional loan in the amount of $1,600,000.00, upon terms to be mutually agreeable to both parties, this company agrees to pay you a brokerage of six percent (6%) of the amount of the loan.

This fee is to cover all costs, whether legal, filing, recording, accounting, etc.

Yours very truly,

Adams Engineering Co., Inc.
/s/ Charles Silvers
 Charles Silvers
 President"

Prudential's analysis of Adams was an intensive one. Levkoff, who was experienced in accounting matters, testified that over a period of five months he spent a substantial

portion of his time at the Adams office working with and assisting its accounting staff in assembling data for Prudential. Finally, between September and November 1957, Knab on behalf of Prudential submitted preliminary proposals for loans of $1,500,000 and of $1,000,000. These were rejected by Silvers. In November a proposal for a loan of $1,250,000 was presented. Its terms were satisfactory to him. He approved in writing and returned it to Knab at Jacksonville, Florida. All of the proposals, including the one thus endorsed, were expressly made subject to the approval of the finance committee of Prudential's board of directors. When submitted to that committee, the loan was sanctioned but an additional condition was added, *i. e.*, that the loan be secured by a five-year term $500,000 life insurance policy on Silver's life.

Sometime between November 26 and December 3 Knab received the finance committee approval which imposed the life insurance condition. His recollection was not clear as to the exact date. But either on the day of receipt or the next day he called Levkoff and informed him of the additional requirement. Levkoff testified that he immediately called Silvers and conveyed the message about the insurance to him. Silvers said, "O.K"; that if "he had to, he had to." Silvers also told Levkoff that he could pass a physical examination; he had bought some life insurance a short time previously and had passed the examination; moreover, he was then engaged in negotiating for $350,000 additional such insurance through his Miami agent. This conversation, which is denied by Silvers, is the most crucial factor in the case. Levkoff advised Knab of Silvers' acquiescence. Knab, in turn, called the Prudential Newark office and relayed the message to Robert Jones, Associate Investment Manager there. Jones again brought the loan to the attention of the finance committee, which approved it. On December 4, 1957, he sent a wire to Knab announcing "Adams Engineering approved with changes in terms as discussed with you." Silvers said he heard from Levkoff or Atwill on December

4 or 5 of the approval. According to Levkoff it was he who conveyed the information to Silvers.

The loan agreement containing the $500,000 policy clause was prepared in final form by Prudential attorneys in Florida and about December 15 or 16 sent to Silvers' attorney, Ehrlich, for review. Ehrlich testified that after perusal he telephoned Silvers to discuss the papers with him and in doing so informed him of the insurance requirement, whereupon Silvers instructed him to do nothing further in the matter. Thereafter, although he had a number of telephone calls from Levkoff, he did not return any of them. Silvers asserted that he called Atwill immediately and objected to "this sudden new requirement," and that Atwill told him not to get excited about it because it would be taken care of. Atwill denied that any such conversation took place.

At this point in the narrative it seems necessary to refer to certain events, some disputed and some conceded by the parties, which according to the testimony took place *after* Silvers' alleged acceptance of the insurance requirement, some time prior to December 3 or 4, 1957 (according to Levkoff), and *after* Silvers' alleged rejection of the demand on December 16 or 17. These events relate to a conference Silvers had with one Gustave Jay, an insurance broker, on January 2 or 3, 1958.

Sometime in December 1957 Levkoff told Abeles of the demand for the insurance policy and, quite obviously, of Silvers' acceptance of the condition. Abeles said he could save Silvers some money on the premium by placing the coverage with a Canadian company. Abeles knew a Newark insurance broker, Gustave Jay, who was a representative of that company. Jay was going to be in Florida on vacation or at a convention around the holidays. Thereafter, Levkoff arranged an appointment with Jay and Silvers. Levkoff knew the meeting between the two men took place because he talked with both of them about it on the telephone afterward. It is plain from this testimony, if credible, that Silvers was not then objecting to the insurance.

The insurance broker Jay (who was a stranger to Levkoff) testified that he saw Silvers in Florida pursuant to an appointment. Silvers was interested in exploring the five-year term policy and its cost. Jay presented the insurance plans which would best fit the requirement, and during the conference Silvers called in another representative of Adams (Jay thought he was the controller) to listen to part of the conversation. Silvers gave Jay a copy of Adams' 1956 Annual Report. The discussion extended into other forms of life coverage. Silvers asked Jay to see his Florida broker and, on Jay's consent, telephoned that person to make an appointment. Jay saw the broker that night or the following night. On defendant's objection, their conversation was excluded. Subsequent to these meetings Jay telephoned Silvers' broker but was not successful in writing any insurance.

Silvers admitted having this conference with Jay, even though he claimed he had told his attorney, more than two weeks earlier, he would not accede to the Prudential request for insurance. His explanation was that since Jay had come all the way from Newark to see him, it would not be "very nice not to see him"; also, he was negotiating at the time with his broker about some additional personal protection, and so was curious. In this connection Silvers denied that Levkoff had ever spoken to him about a proposed visit by Jay. He indicated that the first he knew about the matter was when Jay "apparently phoned [his] office and made an appointment" through his secretary. If his only contact with the Jay appointment before the actual meeting was through his secretary, it must be noted that he offered no statement as to how he knew Jay had come all the way from Newark to see him and when it was that he decided it would be discourteous not to see him. It must be noted also that at no time did he tell Jay that he would not yield to the Prudential request for the policy; yet he admitted he knew Jay's purpose in seeing him was to discuss the policy.

It seems clear that in December 1957 and January 1958 Silvers was negotiating with others about financing for Adams. One such deal under current discussion involved the sale of his stock in the company. He said that if he had sold his stock, that would have been the end of the Prudential transaction.

The Prudential closing was scheduled for December 31, 1957. Neither Silvers nor Ehrlich informed Knab or the Prudential attorneys that the deal was off because of the insurance requirement. On December 20 Knab wrote Levkoff seeking some further information and documents requested by the Prudential attorneys in connection with the closing. Levkoff tried a dozen times unsuccessfully to reach Ehrlich. After some days, he finally managed to have a very short conversation in which Ehrlich said he "was taking care of it." None of the data related to the insurance matter. It was typical closing material, such as Secretary of State certificates showing that Adams and its subsidiary corporations were in good standing.

From this point on the matter began to dawdle, and the closing did not materialize on December 31. Knab said he heard from Abeles that Silvers was contemplating the sale of his stock in Adams. Levkoff testified that he began to experience difficulty in reaching Silvers. As a result, Knab called a meeting for January 14, 1958, to discuss the problem. (Silvers' alleged objection to the insurance demand had nothing to do with Knab's action. No one suggests that Silvers, or anyone else in his behalf, ever informed Knab of any such objection.) The meeting took place on that day at the office of Adams. Abeles, Levkoff and Silvers were present; Knab and Hall appeared for the Prudential. Knab was asked what took place there. He answered:

"I informed Mr. Silvers that I understood from Mr. Abeles that he was contemplating the sale of his stock or some of his stock in the Adams Engineering Company. I wanted the opportunity of clarifying any confusion that might exist in his or anybody else's

mind, that our loan was being made to the Adams Engineering Company, a corporation, and not to him personally, and irrespective of what he did so far as the sale of any of his stock, we expected the loan to close. Mr. Silvers told me—he confirmed the fact that he had been talking to other people and he mentioned the Suede [Schwader?] Brothers and stated that representatives were out in his plant and that he did not feel he should bind Adams Engineering Corporation to a loan such as this while negotiating with others for the sale of his stock and if the sales [?] went through he would be hardly put in the position to succeed. In the face of that, inasmuch as we had quite a bit involved, I told him that we stand ready and able to transact the transaction on the terms agreed to and I expected the loan to close on February 15th which seemed to be ample time to clean up any details. That's about it. [Insertions ours]

Q. Was there any mention made about life insurance at that meeting? A. No, sir."

Silvers conceded that at this meeting he neither mentioned nor raised any objection to the life insurance requirement. But he insisted that he refrained at Atwill's suggestion. Atwill told him, he said, that Abeles was endeavoring to persuade the Home Office in Newark to withdraw the policy demand, and preferred not to have Knab know about it. Atwill denied making such a request. Silvers' testimony shows also that he was then negotiating with Schwader Brothers about the sale of his stock and was concerned with the effect the loan might have on that sale. He said: "At the meeting I asked concerning whether that would hurt my ability to sell the stock to Schwader. Had I made the deal with Schwader I wouldn't have made a deal with him."

According to Knab, at the conclusion of the conference he felt that the loan transaction would be closed. The next day he wrote the following letter to Silvers:

"January 15, 1958

Confidential
Mr. Charles Silvers, President
Adams Engineering Company, Inc.
Ojus, Florida

Dear Mr. Silvers:

In our conference yesterday, you confirmed the information we had received from Mr. Abeles that you were negotiating for the sale of the stock you own in Adams Engineering Company, Inc.

You understand, of course, that Prudential is dealing with Adams Engineering Company, Inc., a corporation, and not with you personally as an individual. Prudential's commitment is firm and we stand ready to make delivery. We fully expect Adams Engineering Company, Inc. to perform on its part in accordance with the terms and conditions it has agreed to accept.

We expect a closing of this loan transaction on or before February 15, 1958.

Sincerely yours,

cc: Mr. J. I. Levkoff
 Mr. Richard Abeles
 Mr. Wm. Atwill"

Abeles testified that at the January 14 meeting what Silvers wanted was an extension of time. The reason given was that the Schwader people were going through his plant, and "he wanted to postpone all this until he found out whether or not he could sell his business."

Some time later in January, the exact date is not clear, according to Abeles, Silvers told him that because of the pending Schwader deal he would like to get a prepayment clause in the mortgage on Adams called for under the agreed Prudential loan plan. Silvers said that such a clause would be a wise course even if prepayment would mean a penalty, because "if he did not make the Schwader deal he had someone else." Abeles testified that between January 16 and 21 Silvers told him that "one of the reasons for not closing the loan was the fact that the insurance fee had been put in with the costs." Later, on January 31, Abeles and Silvers met in New York. On that occasion, in order to bring about the closing of the transaction, Abeles offered to pay the premium out of the commission and to persuade Atwill and Levkoff to go along with the offer. Silvers agreed to take the proposal under advisement, commenting also that he had "a number of deals on the fire" which he thought might be hurt by the closing of the loan.

Abeles advised Atwill and Levkoff of his offer to deduct the premium from their commission. Atwill agreed. Levkoff demurred and telephoned Silvers, saying he was not going to "chisel down" his compensation. But when Abeles

informed him later that he felt obligated to the Prudential and wanted the deal to go through, Levkoff consented.

Silvers first testified that Atwill made the offer to him to have the premiums paid by the brokers. He said that Atwill knew he had been negotiating for a $350,000 policy which would bring his personal protection up to $500,000 and he did not think an insurance company would want to add another $500,000 of coverage on him. But later, in answer to questions by the court, he conceded meeting Abeles in New York and that an offer to pay the premium was made there.

Finally, after receiving an insistent telephone call from Knab, Levkoff called Silvers on February 3, 1958, and advised him of the "yes or no" demand. Silvers then said flatly that "he was not going to make the loan." Levkoff wrote Knab accordingly.

The record reveals that inquiries which had begun around mid-January 1958 eventuated in March or April in the underwriting of a public issue for Adams by the Chicago firm of Krittenden & Podesta. That transaction put some "real cash" in Silvers' pocket; more than the Prudential deal would have provided for him.

In March 1958 Atwill resigned as a director of Adams and assigned his commission agreement to Abeles. This suit followed.

The trial court resolved the conflicting factual and legal issues in favor of plaintiff and concluded that defendant was liable for commissions, *i. e.,* 6% of $1,250,000 or $75,000. Testimony having been offered to show that the closing costs which were to be deducted under the brokerage contract would amount to between $5,000 and $6,000, a judgment was entered against Adams for $69,500. The Appellate Division reversed on three grounds: (1) the plaintiff did not establish by a fair preponderance of the evidence that defendant had agreed to Prudential's added requirement of a $500,000 insurance policy on Silvers' life; (2) plaintiff adduced no proof showing that the purported agreement

between the defendant corporation and its director, Atwill, was fair and reasonable; and (3) plaintiff did not sustain his burden of proof that Silvers had authority to bind the defendant corporation by his agreement with Atwill or the disputed agreement with Prudential.

## (1)

Trial of the case centered around the sharply contested issue whether Silvers accepted the life insurance policy requirement imposed by Prudential Insurance Company as a condition of the loan to Adams. If plaintiff's proof on that subject was believed, then, as the cases cited by the Appellate Division demonstrate, the brokers had produced a lender ready, able and willing to make the loan, and so they had earned their commission. 64 *N. J. Super.*, at *pp.* 177–179. An experienced trial judge saw and heard the contradictory witnesses and believed those of the plaintiff. The Appellate Division, in what appears to have been a *de novo* review of the record, found that the proof did not preponderate in favor of plaintiff. Our study leads us to the conclusion that there was ample evidence to support the finding of the trial judge.

There is no doubt that on review of a non-jury trial judgment an appellate tribunal may make new findings of fact. *R. R.* 1:5–4(*b*). But great care must be exercised not to transfer the proceeding into a completely *de novo* examination of the proof. The qualification appended to the rule marks the basic difference between the application of the eyes, ears and reason of the trial judge to the evidence and the study of the printed record by the reviewing body. We are told that on appeal "due regard must be given to the opportunity of the trial court to judge of the credibility of the witnesses."

When the facts and inference arising from them are not in dispute, there is rarely room for differences in their evaluation at the trial or appellate level. But when the

result of the contest must turn on the truthfulness of witnesses, the superior advantage of the trial judge in seeing and hearing and appraising the disputants must ordinarily be regarded as the fulcrum on which the issue should be resolved. "Face to face with living witnesses, the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases, the exercise of his power of observation often proves the most accurate method of ascertaining the truth. * * * To the sophistication and sagacity of the trial judge the law confides the duty of appraisal." *Boyd v. Boyd,* 252 *N. Y.* 422, 429, 169 *N. E.* 632, 634 (*Ct. App.* 1930); and see *Gilbert v. Gilbert Machine Works, Inc.,* 122 *N. J. L.* 533, 538 (*Sup. Ct.* 1939).

The two most important protagonists in the contest of veracity were Levkoff and Silvers. One affirmed and the other denied the giving of consent to the demand for the life insurance security. The trial court accepted Levkoff's word and found support for it in the statements of Atwill, Abeles and Knab. The Appellate Division criticized Levkoff's recollection as faulty with respect to some aspects of his testimony, particularly dates, and found no substantial corroboration for him in Atwill, Abeles and Knab. We conceive the latter position to be untenable for we see corroboration not only in the assertions of those witnesses but in the surrounding circumstances as well.

In the latter part of November 1957 Silvers had agreed in writing to all of the loan conditions laid down by the Prudential representatives in Florida. Approval by the home office Finance Committee alone remained as unfinished business. That Committee imposed one more requirement—the $500,000 life insurance policy on Silvers' life. At that stage of the negotiations it was natural that Knab should immediately transmit the message to Levkoff, the active local broker for Silvers' company. It is equally natural that Levkoff should lose no time in bringing the new condition to Silvers' attention, and upon receiving his consent, show

equal dispatch in getting the approval to Knab. There is no doubt that Knab then advised the home office of the fact because either on the same day or the next that office wired that the loan "was approved with changes in terms as discussed with you." Since all terms except the insurance had been agreed upon previously, what was the real significance of the wire? Obviously that consent to the insurance had been given. Is it reasonable to believe that Levkoff would have given Silvers' consent without having obtained it? Such a conclusion seems unreal, since many other terms of the loan were previously bargained about between the parties and a solution reached. Particularly is this so since Levkoff must have realized that a provision for the policy would appear in the formal contract. Thus it can be said that the circumstances alluded to provided a measure of corroboration for plaintiff's case.

The Appellate Division regarded as incredible Levkoff's testimony about Silvers' terse "O. K." of the insurance demand. The language of the opinion indicates that the view was generated by the feeling that acceptance would be accompanied by some writing, or at least by some discussion or inquiry as to the cost of such a large policy. But the record is not so barren; it reveals additional facts and an explanation which the trial judge might well have considered reasonable. According to Levkoff, Silvers said "if it had to be, it had to be." Also, he advanced the information that only a short while previous he had acquired some further life insurance, for which he had passed a physical examination. At this trial, cross-examination of Silvers demonstrated the truth of these statements about the acquisition of that additional coverage. Moreover, and of greater significance, the record discloses that he was negotiating at the time to secure $350,000 more insurance. So it is reasonable to assume that he had some knowledge of premium costs of large policies. Against such a background we cannot agree that Levkoff's testimony concerning Silvers' acquiescence in the Prudential policy request was without probative force.

Silvers maintained that he first knew of the policy requirement when his attorney, Ehrlich, so advised him on December 16 or 17, after receiving the loan contract in final form from the Prudential attorneys. His conduct at that point seems odd. He simply instructed his attorney to do nothing more in the matter. He did not communicate his surprise or objection to Knab; in fact, to the very end of the affair he never voiced any protest to Knab about the policy requirement. Nor did he have his attorney make his objection known to the Prudential attorneys who had prepared the contract. This course must have been awkward for Ehrlich. Silvers said he called Atwill immediately and voiced his refusal to accept the new condition. Such action seems strange, since Atwill was the least active of the brokers working on the loan. Manifestly Levkoff, the local workhorse of the trio of brokers, would be the logical one to receive the protest. Here we meet the first conflict between Silvers and Atwill; the latter flatly denied receiving any such call or message from Silvers. It is curious, too, that Adams' directors' meetings were held on December 17 and 28. At neither meeting did Silvers utter any protest or comment to Atwill about the insurance requirement.

The Jay incident furnishes corroboration for Levkoff. It is fully established that Abeles, after learning of the policy demand, promoted a meeting between Jay and Silvers in an effort to work out a lower premium for Adams. Although denied by Silvers, the circumstances strongly suggest that Levkoff made the actual appointment for Jay to discuss the problem with him. At this conference Silvers did not exhibit opposition to the Prudential demand. On the contrary, he called in some other Adams official in the course of the discussion, and later arranged for Jay to consult with his own broker. Once again we have an odd silence from a man who testified that his only objection to completing the loan was the insurance demand.

Thereafter, the January 14 meeting called by Knab entered the scene. Again he failed to voice his only objection, namely,

the insurance demand. It does not seem unreasonable now to deem the silence a little louder and more significant. He said the lack of mention was due to Atwill's request—allegedly made to permit Abeles (without embarrassing Knab) to endeavor to persuade the Home Office to withdraw the demand. Once again the two men, Atwill and Silvers, contradict each other. Atwill denied he made any such suggestion. In this connection the facts strongly suggest that Silvers' activity with the Schwader Brothers impelled him to seek delay of the loan closing—or perhaps to avoid it altogether, after having committed his company to it. Even after obtaining postponement of the closing date to February 15, after further pressure from Knab, he finally simply said to Levkoff on February 3 that he did not intend to make the loan. But he never informed Knab either orally or in writing that the $500,000 policy was the real reason for his stand.

There is no dispute that Silvers and Abeles met in New York on January 31, 1958, and that Abeles, in an effort to complete the transaction, offered to absorb the insurance premium. This was done, he said, after Silvers had complained about the inclusion of the premium in Adams' cost of negotiating the loan. The parties agree that within a few days after saying he would consider the offer, Silvers terminated the entire matter. At this juncture it cannot be ignored that negotiations had already begun looking to financing for Adams by the Krittenden & Podesta firm. Those negotiations came to fruition in March 1958 and, by May or June, profited Silvers personally more than the Prudential loan would have done.

██ Appraisal of the entire record shows beyond question that in the decision-making process the issue of credibility was the most important factor. In such a context the conscientious conclusion of the trier of the facts as to which witnesses were more worthy of belief must be given great weight and accepted by the appellate tribunal unless clearly lacking reasonable support. *Gregory Manor v. City of*

*Clifton,* 53 *N. J. Super.* 482 (*App. Div.* 1959); *New Jersey Highway Authority v. J. & F. Holding Co.,* 40 *N. J. Super.* 309, 317 (*App. Div.* 1956); *Dacunzo v. Edgye,* 33 *N. J. Super.* 504, 508 (*App. Div.* 1955), affirmed 19 *N. J.* 443 (1955). After our own analysis of the evidence, we are strongly of the view that the trial judge was amply justified in concluding that the greater weight of the believable evidence warranted a finding that Silvers had agreed to comply with the Prudential demand for the life insurance policy. The contrary holding of the Appellate Division cannot be sustained.

## (2)

■ The Appellate Division reversal was predicated also on the ground that plaintiff had produced no proof to establish that the brokerage agreement (which it found to be) between the defendant corporation and its director Atwill was fair and reasonable. We agree with the view expressed in the opinion that a contract between a corporation and one of its directors, made without approval of the stockholders, is not enforceable by the director unless it is honest, fair and reasonable. The burden of demonstrating those elements by clear and convincing proof is on the director. In this area the law of Florida and New Jersey is the same. *Hill Dredging Corp. v. Risley,* 18 *N. J.* 501, 531 (1955); *Eliasberg v. Standard Oil Co.,* 23 *N. J. Super.* 431, 444 (*Ch. Div.* 1952), affirmed o. b. 12 *N. J.* 467 (1953); *Orlando Orange Groves Co. v. Hale,* 107 *Fla.* 304, 144 *So.* 674 (*Sup. Ct.* 1932); *Chipola Valley Really Co. v. Griffin,* 94 *Fla.* 1151, 115 *So.* 541 (*Sup. Ct.* 1927).

■ Plaintiff contends that the brokerage agreement (appearing verbatim *supra*) was made with Atwill & Company, Inc., a Florida corporation, and not with Atwill as an individual. Therefore, the argument continues, since the contract was between two corporations having common directors or officers, it has the express sanction of the defendant's charter, and thus the doctrine requiring proof

of fairness is not applicable. It is true that defendant's certificate of incorporation provides that no contract between it and another corporation shall be affected or invalidated by the fact that the contracting parties have one or more common directors. Assuming validity of such a provision, inquiry by a court with respect to fairness of the agreement to each corporation is not foreclosed. *Helfman v. American Light & Traction Co.*, 121 *N. J. Eq.* 1, 17 (*Ch.* 1936); *Mayflower Hotel Stockholders Protective Committee v. Mayflower Hotel Corp.*, 89 *U. S. App. D. C.* 171, 193 *F. 2d* 666 (*D. C. Cir.* 1951); *Des Moines Bank & Trust Co. v. George M. Bechtel & Co.*, 243 *Iowa* 1007, 51 *N. W. 2d* 174 (*Sup. Ct.* 1952); *Fletcher, Cyclopedia Corporations* § 915, *pp.* 333–335 (1947). The soundness of the rule authorizing scrutiny regardless of the charter clause becomes manifest in a case like this one. Atwill is the sole owner and operator of Atwill & Company, Inc., and to permit a corporate facade to stand in the way of a fairness inquiry would be to subvert a doctrine which has its roots deep in common law policy.

We find, however, on a consideration of all the circumstances disclosed by the record, that the brokerage contract is in fact a corporate undertaking of Atwill & Company, Inc. The reasons therefor need not be expounded at length because, regardless of that fact, · under the circumstances present here we agree that plaintiff's burden of proof includes the requirement for demonstrating the fairness of the commission agreement.

On the whole record the only respect in which the proof of fairness of the contract may be said to be deficient is the amount of the commission agreed to be paid, *i. e.,* 6% of the loan procured by the broker. Plaintiff appears to have realized the need for such evidence because he began to question Atwill as follows: ·

"Q. Are there any special problems in securing financing for Florida business companies?
Mr. Schulter: I object.
The Court: What is the relevancy of this?

Mr. Fox: Withdraw this line of questioning.

Mr. Schulter: Do you mean there is any dispute as to the 6% being reasonable or not?

The Court: I do not think there is any question about that.

Mr. Schulter: There is, your Honor. The loan was being worked on.

The Court: I do not see how this can be relevant in this action. Sustain the objection."

At that stage the matter was dropped. The court apparently felt that the express contract for 6% was controlling. And the theory of plaintiff's offer of proof or of defendant's objection was not explained to him beyond the excerpt quoted. We agree under the circumstances that the judgment of the trial court must be reversed for that lack of proof and the matter remanded for a new trial on this phase of the case but limited to the single question of fairness and reasonableness of the stipulated 6% commission. If that rate is found to be unreasonable, in the sense of being excessive, it would follow in the peculiar factual context of the case that the necessary adjustment should be ordered.

According to the testimony, by agreement among themselves Levkoff and Abeles were to receive 4% (2% each) and Atwill 2%. Defendant argues that Levkoff and Abeles did most of the work, and that Atwill did nothing but locate a broker with experience in loan transactions and arrange for his services. That circumstance, it is said, is indicative of the unfairness to the corporate defendant of the 6% arrangement. Atwill did say, among other things, that "introducing a borrower to effective people who can make a loan is adequate reason for [his] compensation." It cannot be gainsaid that such participation by itself in ordinary brokerage transactions is commonly recognized as a compensable factor. But the testimony shows also that he participated in meetings and discussions thereafter during the negotiations. And it does not appear specifically that such participation was considered as an integral part of his duties as director of defendant.

■ Defendant claims further that the willingness of the three brokers to pay the premiums on the large life insurance policy is evidence of the unfairness of a 6% commission. The impact of such fact is, of course, for the trier of the facts. But the situation in which the offer was made should not be ignored. According to Abeles it represented a last ditch effort to save a transaction in which he felt he had some obligation to the agreed lender which had devoted time and effort to the negotiations. Whatever implications of unfairness, if any, may be said to emanate from the brokers' offer to Silvers, it is to be assumed that they will be balanced on the retrial against a commonplace philosophy of business life that very often half a loaf is better than victory less expenses of litigation. In this connection it should be noted that we adopt the Appellate Division holding that the premiums are not deductible as closing costs within the last paragraph of the brokerage agreement. 64 *N. J. Super.*, at *pp.* 176, 177.

It is not necessary to discuss the various arguments of the parties on this issue. The problem is not for our determination. All of the relevant factors may be presented to the trial court for its consideration.

### (3)

As a final ground of reversal the Appellate Division declared plaintiff had failed to prove that Silvers had authority to make the brokerage contract or the disputed loan agreement with Prudential. We do not agree.

■ The issue, although raised in the answer, was not specifically included in the pretrial order. Nor was it presented as a ground for judgment on defendant's motion at the trial. It was made a ground of appeal, however, and since the Appellate Division dealt with it on the merits, we shall do likewise.

At the outset attention is drawn to the fact that at the trial no proof, oral or documentary, was offered to show

the extent of or any express limitations on Silvers' powers as president of Adams. Silvers did not testify to any lack of authority to employ the broker or to make the loan contract, nor did any other person connected with defendant offer evidence on the subject.

Silvers and his family owned 89% of the stock of Adams. He was its president. Atwill, a director and obviously familiar with the management, testified that Silvers "managed the company completely"; that he was "the main show." Levkoff said Silvers "ran the company and everybody took orders from" him.

Financing for Adams was discussed at directors' meetings and Silvers asked Atwill to explore the possibilities of an institutional loan. The record is replete with discussion and actions by him concerning other financial deals which point to broad corporate authority. For example, even in this very matter he gave written approval on behalf of defendant to what was considered by the parties at that time to be the final proposal for the loan. No one suggests that he lacked power to do so or that the Board of Directors' approval was sought or given. Moreover, defendant did in fact obtain financing from Krittenden & Podesta early in 1958 with Silvers conducting the negotiations. No proof was introduced to show that his consummation of that deal was authorized prior thereto by the directors. His testimony on the subject was: "I came to an agreement with them in either March or April."

The problem of Silvers' agency to bind his corporation with respect to the agreements was clearly one of fact. An affirmative finding on that score is implicit in the trial court's determination. He said, for example: "I think on the basis of the weight of the testimony I have no choice but to find that the change in the amount of $1,600,000 to $1,250,000, where it ended up, was agreed to by the defendant company. I think that the insurance fee was agreed upon. * * *"

In the light of the whole record we are convinced, and so conclude, that the evidence was adequate to sustain a finding that Silvers had authority to bind the defendant to the agreements in question and that he did actually bind it thereby.

## (4)

All other grounds, either of appeal or in support of the Appellate Division opinion, urged by the parties have been considered and in view of the result reached by us require no discussion. Plaintiff's claim to interest on any judgment properly rests in the sound discretion of the trial court.

## (5)

The reversal of the judgment by the Appellate Division is modified in accordance herewith, and the cause is remanded to the trial court for determination of a single issue, *i. e.*, whether a brokerage commission of 6% is fair and reasonable under all of the circumstances of the case.

*For modification and remandment*—Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—6.

*Opposed*—None.