**Robert BILODEAU, Walter J. Mecleary, et al., Appellants,**

v.

**David WEBB, John Bailey, Allen Wheeler, David Hagey, KPMG Peat Marwick, L.L.P., Richard H. Thompson, on Behalf of Himself and All Others Similarly Situated, et al., Appellees.**

No. 13–03–529–CV.

Court of Appeals of Texas, Corpus Christi–Edinburg.

Aug. 22, 2005.

Shirley Selz, Gary, Thomasson, Hall & Marks, Corpus Christi, for appellants.

Roger L. Mandel, Marc R. Stanley, Stanley Mandel & Lola, Jonathan Eric Smaby, Michelle E. Roberts, Roberts & Smaby, Ralph I. Miller, Earl B. Austin, Timothy W. Mountz, Baker & Botts, Robert R. Summerhays, Ray Guy, Weil Gotshal & Manges, Dallas, Marc B. Kramer, Short Hills, NJ, Michael S. Etkin, Roseland, NJ, Michael James Krueger, Kingsville, Darrell L. Barger, Hartline Dacus Barger Dreyer, Russell H. McMains, Law Office of Russell H. McMains, Jorge C. Ramgel, The Rangel Law Firm, A.E. Pletcher, Mike Hummell, Huseman & Pletcher, Corpus Christi, G. Paul Howes,

Joy Ann Bull, San Diego, CA, Joseph S. Allerhand, New York, NY, Rebecca Robertson, Houston, K. Alan Parry, Raleigh, NC, for appellees.

Before Justices HINOJOSA, YAÑEZ and CASTILLO.

## OPINION

Opinion by Justice CASTILLO.

In this case, the underlying dispute arose subsequent to entry of a settlement in a class action lawsuit in which both appellants [1] and appellees [2] were identified as prospective class members. Appellants do not contest the settlement but challenge the manner of its implementation and distribution under the Plan of Allocation. The trial court rejected appellants' claims and entered an "Order Approving Plaintiffs' Distribution of Settlement Proceeds." The trial court denied appellants' motions to reconsider and to disqualify class counsel. This appeal ensued. We affirm.

## I. Background

Appellants and appellees were originally shareholders in separate companies acquired by Heartland Wireless Communications, Inc. ("Heartland") in 1996. Appellants were owners of Three Sixty Corporation and its subsidiary, Technivision, Inc. (hereinafter "TSC"). Appellees ("UltraVision") were owners of UltraVision of Texas, Inc. and its sister companies. The acquisitions involved the payment of some cash and the transfer of Heartland shares of stock.

TSC was sold to Heartland in February 1996 for approximately $36,750,000, with the entire consideration paid to TSC in registered shares of Heartland common shares. Five million dollars worth of those shares were placed in an indemnity escrow for eighteen months, with provision for a partial release after twelve months, to ensure TSC's performance of its post-closing obligations.

UltraVision was sold to Heartland in June 1996 for $3,500,010, with 10% paid in cash and the remainder paid in unregistered shares of Heartland stock.[3] One hundred thousand dollars worth of those shares were placed in an indemnity escrow for six months to ensure UltraVision's performance of its post-closing obligations.

Subsequent to the acquisitions but prior to the termination of the escrow account (TSC shares) and prior to the time that UltraVision shares could be publicly sold, Heartland stock plummeted in value. A lawsuit was brought against Heartland and its accounting firm as a class action on behalf of "all persons who purchased or acquired the common stock of [Heartland] between November 15, 1995, and March 20, 1997" (the "Settlement Class Period").[4]

1. Appellants are Robert Bilodeau, Walter J. Mecleary, Hector R. Gonzales, Ernest Manuwald, Robert H. Greenwood, Anna–Lisa Bilodeau, Ella Mae Manuwald, Paul Chiaverini, Theresa Mecleary, Maria T. Mecleary, Rand Capital Corporation, ERCM Investments, Charles Ughette, Capital Cable Partners, Robert Zitter, Edward D. Horowitz, Engineered Sales Company, Douglas Dittrick, Workaids Corp. Emp. Ret. Trust, Workaids Corp. Emp. Pen. Plan, Irving Bialer Assoc. Inc. Emp. Ret. Plan, Irving Bialer Assoc. Inc. Emp. Pen. Plan & Trust, Harold F. Lenfest, James Arrow and all other claimants whose claims are based on receipt of Heartland common

stock held in escrow during the Settlement Period.

2. Appellees are Richard Thompson on behalf of himself and others similarly situated.

3. Securities regulations at the time precluded those shares from being sold to the public until a date after the end of the Class Settlement Period.

4. We note that the underlying lawsuit was initiated by the plaintiff class against Heartland on July 15, 1998. However, appellants

The causes of action included allegations of false and misleading statements in connection with the sale of the stock, false financial statements, negligent and intentional misrepresentation, fraud, and conspiracy. The underlying plaintiffs moved to certify a class, but before the trial court could do so, a stipulation of settlement was filed. Following a hearing, the trial court entered separate orders approving the proposed Plan of Allocation for distribution of the settlement fund [5] and awarding attorney fees to class counsel. On that same date, January 25, 2002, the trial court also entered a final judgment identifying the settlement class and sub-classes and approving distribution of settlement monies. The class notice was approved and forwarded to putative class members.

Disputes arose in 2003 over the manner of implementation and distribution of the settlement as set out in the Plan of Allocation. The Plan of Allocation provided for a value to be assigned to a share of Heartland common stock based upon its date and manner of acquisition, as well as its date of sale. All open market purchases of Heartland stock were limited to 5% of the net settlement fund.[6] Claimants who received unrestricted shares of stock as consideration for companies sold to Heartland during the Settlement Class Period were limited to 10% of the net settlement. The remaining 85% of the net settlement fund was to be designated for those claimants who received restricted shares of stock as consideration for companies sold to Heartland during the Settlement Class Period.

Appellants challenged not the methodology but the manner of distribution of settlement proceeds based upon the Plan of Allocation, including how shares of stock were categorized. After a hearing, a formal order was entered June 19, 2003, approving class counsel's plan for distribution and finding: (1) the claims of some of appellants ("TSC–A"—prior officers, directors or employees of TSC)[7] were barred by a prior release dated September 1, 1998; and (2) claims of other TSC appellants[8] were properly denied because the stock in issue "was not acquired" during the Settlement Class Period.

TSC brings this appeal challenging distribution of the settlement proceeds and, particularly, the trial court's failure to include TSC in 85% of the settlement fund.

## II. Issues on Appeal

Challenging three trial court orders, TSC's issues on appeal are:

1. The trial court erred as a matter of law in finding that the release of September 1, 1998, bars the claims of TSC–A.

2. The trial court erred as a matter of law in finding that shares transferred to the escrow account on behalf of TSC were not "acquired" during the Settlement Class Period.

3. The trial court erred as a matter of law in failing to find that registered TSC shares placed into the escrow account were "restricted stock," and

---

were not necessarily aware of this litigation at that time and, indeed, did not appear in this matter until after they received copies of the class notice.

**5.** Value of the total settlement was $5,050,000.

**6.** The "Net Settlement Fund" was defined to be those monies remaining after payment of

litigation and administrative expenses, and attorney fees.

**7.** These include Robert Bilodeau, Walter J. Mecleary, Hector R. Gonzales, Ernest Manuwald, and Robert H. Greenwood.

**8.** These individuals include the remaining appellants in this matter.

therefore eligible to participate in the 85% portion of the settlement fund.

4. The trial court abused its discretion in (a) failing to disqualify class counsel and require full or partial fee forfeiture, and (b) denying TSC's motion for an affirmative award of fees and expenses.

## III. Analysis

### A. The Release

In their first issue, appellants argue that the trial court erred as a matter of law when it found that the Release of September 1, 1998, barred the claims of former or current TSC officers, directors and employees.

### 1. Standard of Review

■■■ A trial court's conclusions of law are not binding on this Court, and we are free to make our own legal conclusions. *Harlingen Irrigation Dist. Cameron County No. 1 v. Caprock Communications,* 49 S.W.3d 520, 530 (Tex.App.-Corpus Christi 2001, pet. denied); *Muller v. Nelson Sherrod & Carter,* 563 S.W.2d 697, 701 (Tex.Civ.App.-Fort Worth 1978, no writ). "Conclusions of law are reviewed de novo as a question of law and will be upheld if the judgment can be sustained on any legal theory supported by the evidence." *Harlingen Irrigation Dist.,* 49 S.W.3d at 520 (citing *Circle C Child Dev. Ctr., Inc. v. Travis Cent. Appraisal Dist.,* 981 S.W.2d 483, 485 (Tex.App.-Austin 1998, no pet.)). A trial court's conclusions of law

may not be reviewed for factual sufficiency and may be reversed only if they are erroneous as a matter of law. *Stable Energy, L.P. v. Newberry,* 999 S.W.2d 538, 547 (Tex.App.-Austin 1999, pet. denied); *Hofland v. Fireman's Fund Ins. Co.,* 907 S.W.2d 597, 599 (Tex.App.-Corpus Christi 1995, no writ). Incorrect conclusions of law do not require reversal, provided that the controlling findings of fact support a correct legal theory. *Stable Energy,* 999 S.W.2d at 547.[9]

### 2. Factual History of the Release

Subsequent to the acquisition of TSC by Heartland, a dispute arose concerning Heartland's misrepresentations with respect to the February 1996 acquisition of the TSC subsidiary Technivision, Inc. No formal suit was filed, but a proposed federal complaint was prepared and tendered to Heartland setting forth causes of action, which included negligent misrepresentation and securities fraud in association with the same purchase/acquisition at issue in this matter. The parties ultimately entered into a mutual release which discharged all claims of TSC, its former and current parent corporations, subsidiaries, predecessors, successors, officers, directors, and employees. The claims released include all existing and potential claims related to the "dispute." The release, effective September 1, 1998, recites that the dispute concerns the Technivision Acquisition, the Amended and Restated Asset Purchase Agreement (dated October 19, 1995), the Sales Tax Agreement (dated March 15, 1996), and all claims and issues

---

9. We note appellees' contention that the appropriate standard of review is abuse of discretion. Although the procedural posture of the case is not typical, the finding at issue is one which addresses entitlement to recover under a portion of the settlement:

> The Court hereby finds and concludes that the claims of [TSC–A] are denied and will

> not be paid because the claims at issue in the captioned case were released by each of them in the Settlement Agreement and Mutual Release dated effective as of September 1, 1998.

Whether or not the claims to participate in the larger portion of the settlement fund are so precluded is a matter of law.

asserted in the attached draft complaint. The attached draft complaint addresses the entire sale of TSC to Heartland for $36.75 million. That complaint articulates causes of action and facts very similar, if not identical, to those raised in the underlying class action. The release therefore extends to the same subject matter in issue in the class action below. This is not disputed by the parties.

In dispute is the authority of the then-treasurer of TSC to sign and effect the release on behalf of its individual officers, directors and employees (TSC–A). Included in the release are "warranties and representations" that the individual executing the agreement on behalf of TSC was fully authorized to do so. The release was executed in accord with the laws of the State of New Jersey.

### 3. New Jersey Law—Corporate Releases

Since our review is de novo, and since the 1998 release was executed subject to the law of New Jersey, we review that law to determine what authority was required for a corporate officer to enter a binding release.

### 3.a. Authority of the Treasurer

 The 1998 release was executed by the treasurer of the corporation on behalf of the corporation. It is settled New Jersey law that an officer or agent can only bind a corporation to the extent that the power to do the act in question has been (1) expressly conferred upon the officer or agent by the charter, by-laws or corporate action of the stockholders or board of directors, or (2) can be implied

from the powers expressly conferred, or which are incidental thereto, or (3) where the act is within the apparent powers which the corporation has caused those with whom its officers or agents have dealt to believe it has conferred. *Horner v. Georgia Cas. Co.*, 100 N.J.L. 347, 126 A. 289, 290–91 (1924); *see also Tannenbaum & Milask v. Mazzola*, 309 N.J.Super. 88, 706 A.2d 780, 783 (1998, no writ). One dealing with a corporation must inform himself as to the authority of the one purporting to act for the corporation if he seeks to hold the corporation to an agreement made through the agent. *Horner*, 126 A. at 290. However, it is equally well settled that a "principal is bound by the acts of the agent within the apparent authority which he knowingly permits the agent to assume or which he holds the agent out to the public as possessing." *Alicea v. New Brunswick Theological Seminary*, 244 N.J.Super. 119, 581 A.2d 900, 905 (1990) (citing *Abeles v. Adams Eng'g Co., Inc.*, 64 N.J.Super. 167, 165 A.2d 555, 567 (1960), *cert. granted*, 34 N.J. 327, 168 A.2d 692 (1961), *judgm't modified on other grounds*, 35 N.J. 411, 173 A.2d 246 (1961)).

There is no evidence in the record before us that any challenge was ever raised to the authority of the treasurer of TSC to bind that corporation in the 1998 release, and no evidence has been presented to suggest that challenges were raised to the legitimacy of that release at the time it was executed.[10] There is evidence, which was not controverted, that Heartland relied upon the TSC treasurer's authority. This constitutes, at a minimum, evidence of apparent authority.[11] *Id.*

---

**10.** At the motion for reconsideration hearing, Bilodeau testified that the TSC treasurer who signed the release is deceased. Bilodeau denied knowledge of the release until his claim was denied. He denied he authorized the

treasurer to execute the release either officially or individually.

**11.** This reliance is set out in the affidavit of Curtis Henderson, general counsel to Heart-

### 3.b. Ownership of the Causes of Action

■ Presuming the treasurer had full authority to execute the release on behalf of the corporation, we must next determine whether that authority, which effectively binds the corporation, in any manner impacts the claims of appellants TSC–A in this suit.

The original dispute between TSC and Heartland resolved by the 1998 release was brought in the name of the TSC corporation. Part of the settlement included Heartland's concession to release TSC, as a corporation, from its obligations under the Sales Tax Agreement. This resolution effectively addressed a complaint of the TSC corporation by transferring a benefit to that same TSC corporation.

The causes of action released in the 1998 release do not fall within a prescribed exception (such as where a wrongdoer violates a duty owing directly by him to the stockholder, or a fiduciary relationship requires the wrongdoer to protect the interest of the stockholders, and this duty was violated). *Id.* The claims in issue were for conduct directed to the TSC corporation, which induced it to sell its assets to Heartland. Paragraphs 8–9 of the draft complaint provide:

> As a result of these representations, TSC entered into an agreement ... to sell Heartland substantially all of its assets in exchange for shares of Heartland common stock ... TSC agreed that shares ... would be held in escrow for a period of approximately eighteen months to satisfy certain potential indemnification obligations of TSC to

Heartland.... There was a direct relationship between the price of Heartland common stock and the number of shares TSC would receive in exchange....

The causes of action, as articulated, also reflect that "TSC did in fact rely upon the material misrepresentations," that "TSC exchanged substantially all of its assets," and then TSC "also suffered a loss of at least $5 million, the value of the stock it agreed to accept and hold and escrow" (paragraphs 40, 41).[12] The alleged misrepresentations and fraud which resulted in the sale of the company to Heartland were compensated for in the exchange of benefits set out in the release.

■ Texas black-letter corporations law provides that a cause of action for injury to the property of a corporation, or the impairment or destruction of its business, is vested in the corporation, as distinguished from its stockholders, even though it may result indirectly in the loss of earnings to the stockholders. *MBank Abilene, N.A. v. LeMaire,* 1989 WL 30995, 1989 Tex.App. LEXIS 801 (Tex.App.-Houston [14th Dist.] 1989) (designated for published) (quoting *Commonwealth of Mass. v. Davis,* 140 Tex. 398, 168 S.W.2d 216, 221–22 (1942)). Generally, the individual stockholders have no separate and independent right of action for injuries suffered by the corporation which merely result in the depreciation of the value of their stock. *Id.*

On its face, the 1998 release reflects that (1) the causes of action belonged to the corporation, and (2) the officer executing the release had the authority to do so on behalf of the corporation and the individual

---

land, who was involved in negotiation of the acquisition and subsequent dispute and settlement agreement with TSC.

**12.** We also note John Bailey's affidavit, attached to the Plaintiffs' Memorandum of Law in Support of Motion for Approval of Settle-

ment and Plan of Allocation of Settlement Proceeds, which states that the acquisition of TSC was a bit different, because "[i]ts shareholders consisted primarily of entities as opposed to individual investors."

officers and directors as enumerated.[13] The extension of the release to those officers and directors is consistent with the law and with the claims as articulated.

We conclude that the trial court did not err as a matter of law when it determined that those individuals who had previously released their complaints against Heartland, TSC–A, by and through the TSC corporation, were barred by that release from participation in the settlement. We overrule the first issue presented.

### B. The Date of Acquisition of Escrowed Shares

The trial court's finding, articulated in the order of June 19, 2003, reflects its conclusion that the claims of the remaining TSC appellants "and all other claimants whose claims are based on receipt of Heartland common stock held in escrow until late-March 1997 and October 1997 are denied and will not be paid because the stock at issue was not acquired during the Settlement Class Period." In their second issue, appellants TSC argue that the trial court erred as a matter of law in reaching this conclusion. Appellees counter that the trial court was correct and that, because TSC's shares were not "acquired" during the defined Settlement Period, appellants are not members of the settlement class at all.

### 1. Standard of Review

For the same reasons set forth above in our discussion of the release, we conclude

this is a question of law to be reviewed de novo and reversed only if it is erroneous as a matter of law. *Harlingen Irrigation Dist.*, 49 S.W.3d at 520.

### 2. Factual Background of the Escrow Account

The sale of TSC to Heartland, effective February 23, 1996, involved the immediate transfer of numerous shares in Heartland to TSC. However, $5,000,000 worth of shares were placed into an indemnity escrow account, as noted above, to ensure TSC's performance of its post-closing obligations. Records reflect these shares remained in escrow until late-March 1997 and October 1997. To be eligible to participate in the settlement, the shares in Heartland had to be acquired between November 15, 1995, and March 20, 1997.

### 3. Analysis

Appellants urge that, under Texas law, the grantee of a conveyance of real property held in escrow is the owner of the equitable title to the property conveyed, even though legal title does not transfer from the grantor until the conditions of the escrow agreement are satisfied. *Cowden v. Broderick & Calvert, Inc.*, 131 Tex. 434, 114 S.W.2d 1166, 1169 (1938). Moreover, upon performance of the condition and delivery of the deed, the title acquired thereby "relates back to the time when the deed was placed in the custody of the escrow

13. We further note that the Escrow Agreement between TSC and Heartland, which accompanied the Amended and Restated Asset Purchase Agreement, relates that "TSC shall act as the representative of the persons entitled to receive ... the Escrow Shares and the Consent Shares, in accordance with the Escrow Agreement." It continues:

TSC is vested with the authority, duty and responsibility to represent the interests of the Three Sixty Stockholders in the escrow

funds ... [and] the resolution, action, decision, consent or instruction of TSC shall be final, conclusive and absolutely binding upon each of the Three Sixty Stockholders, and Heartland and the Escrow Agent may rely upon any such resolution, action, decision, consent or instruction of TSC as being the resolution, action, decision, consent or instruction of each and all of the Three Sixty Stockholders.

agent." *Id.* "[A]s between the parties to the escrow agreement and deed, effect will be given to their intention, evidenced by the instruments, that the deed shall upon performance of the condition take effect from the date of delivery in escrow." *Id.*

■ However, this matter does not involve the transfer of real property but, rather, the issuance of shares of securities. In their response to Contestants' Brief in Support of their Motion for Reconsideration or Alternatively for New Trial, appellees assert that the acquisition of securities is determined by article 8 of the Texas Uniform Commercial Code. The cited sections of the act provide that "a person acquires a security or an interest therein ... if ... the person is a purchaser" [14] and "[d]elivery of a certified security to a purchaser occurs when (1)[t]he purchaser acquires possession of the security certificate." [15] Delivery can also occur when:

> (2) another person, other than a securities intermediary, either acquires possession of the security certificate on behalf of the purchaser or ... acknowledges that it holds for the purchaser; or
>
> (3) a securities intermediary acting on behalf of the purchaser acquires possession of the security certificate, only if the certificate is in registered form and is (i) registered in the name of the purchaser, (ii) payable to the order of the purchaser, or (iii) specially indorsed to the purchaser by an effective indorsement and has not been indorsed to the securities intermediary or in blank.

TEX. BUS. & COM.CODE ANN. § 8.301 (Vernon 2002). The Amended and Restated Asset Purchase Agreement between TSC and Heartland identifies the company holding the $5,000,000 worth of shares in consent escrow, Harris Trust Company of New York, as the "exchange agent." [16] The Escrow Agreement between TSC and Heartland further provides that the escrow agent is charged to hold, safeguard and dispose of the fund in accord with the terms of that agreement, and to "treat such fund as a trust fund in accordance with the terms hereof and not as the property of TSC." Importantly, this agreement states that escrow and consent shares shall issue and be held "in the name of" the escrow agent. "Delivery" of the shares to TSC shall occur only upon satisfaction of the conditions on the escrow fund. By contrast, the definition of "delivery" provided in the business and commercial code provides that delivery to an intermediary or agent is effective to constitute delivery to the purchaser only where the certificate is registered in the name of the purchaser at that time: Such is not the case here.

We conclude that, while ownership of the shares could potentially have transferred to TSC at the time of transfer to the escrow agent, the agreement between the parties was specifically structured to provide otherwise. Based on that specific language, we conclude that TSC did not "acquire" the shares during the Settlement Class Period. We affirm the finding of the trial court and overrule the second issue on appeal.

## C. The "Restricted" Shares Issue

In its third issue, TSC argues that the trial court erred as a matter of law in failing to find that the registered TSC

---

**14.** TEX. BUS. & COM.CODE ANN. § 8.104(a) (Vernon 2002).

**15.** TEX. BUS. & COM.CODE ANN. § 8.301 (Vernon 2002).

**16.** The separately attached Escrow Agreement identifies that same entity as the "escrow agent."

shares placed in escrow were "restricted" shares and therefore eligible to participate in the 85% portion of the settlement fund. Because we have found that the shares were not "acquired" during the Settlement Class Period, we conclude, as did the trial court, that we need not reach this issue.[17]

## D. Challenges to Class Counsel

In its fourth and fifth issues, TSC argues that the trial court abused its discretion in failing to disqualify class counsel and require full or partial fee forfeiture, and in denying TSC's motion for an affirmative award of attorney fees and expenses.

## 1. Standard of Review

In reviewing a trial court decision under an abuse of discretion standard, we must determine whether the trial court acted without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex. 1985). The exercise of discretion is within the sole province of the trial court, and an appellate court may not substitute its discretion for that of the trial judge. *Johnson v. Fourth Ct.App.,* 700 S.W.2d 916, 918 (Tex.1985). Rather, an abuse of discretion occurs only when the trial court reaches a decision that is "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Id.* at 917.

## 2. Analysis

Generally, conflicts of interest in class actions arise amidst concerns that class counsel has been tempted to further its own interest in securing exorbitant fees as against the interests of the class members. *See Gen. Motors Corp. v. Bloyed,* 916 S.W.2d 949, 953 (Tex.1996). Clearly, class counsel owes a fiduciary duty to protect the interests of absent class members. *Id.* Here, appellants allege that class counsel has favored one portion of the class as against appellants. However, we have concluded that the claims in dispute center around a portion of the settlement to which appellants were not entitled in the first place. Because TSC did not "acquire" the escrowed shares during the Class Settlement Period, TSC did not fall within the class with respect to those escrowed shares. No conflict of interest arises simply because different subclasses are designated as part of a settlement fund. *Farmers Ins. Exchange v. Leonard,* 125 S.W.3d 55, 65–66 (Tex.App.-Austin 2003, no pet.).[18]

---

**17.** We nevertheless note that the business and commercial code requires that a certified security note any restrictions on the certificate itself. Tex. Bus. & Com.Code Ann. § 8.204 (Vernon 2002). The Asset Purchase Agreement between TSC and Heartland does not provide for any restrictive language associated with the shares, which were registered. By contrast, the *Asset Purchase Agreement* between UltraVision and Heartland includes a specific Exhibit 1.2, entitled "Restrictive Legend" which articulates specific restrictions. The term "restricted" is specifically used in the transaction and is a term with known and accepted meaning in the context of securities law.

**18.** We note the arguments raised in *Farmers Ins. Exchange v. Leonard,* 125 S.W.3d 55, 65–66 (Tex.App.-Austin 2003, no pet.), with respect to the potential for conflicts between settlement sub-classes competing for "the maximum return from the settlement fund," a scenario which is asserted here. We similarly distinguish *Amchem Prods. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) and *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), each of which dealt with personal injury damages. In this case, determination of entitlement to various portions of the settlement fund is a matter of law, and that entitlement can be calculated to a mathematical certainty. *Farmers,* 125 S.W.3d at 66–67.

Adequacy of representation is a question of fact addressed to the sound discretion of the trial court. *Weatherly v. Deloitte and Touche*, 905 S.W.2d 642, 651 (Tex.App.-Houston [14th Dist.] 1995, writ dism'd w.o.j.). There is no abuse of discretion in finding adequacy if there is evidence to support the finding. *Glassell v. Ellis*, 956 S.W.2d 676, 681–82 (Tex.App.-Texarkana 1997, pet. dism'd w.o.j.). Only a conflict that goes to the very subject matter of the litigation will defeat a finding of adequacy. *Nissan Motor Co., Ltd. v. Fry*, 27 S.W.3d 573, 583 (Tex.App.-Corpus Christi 2000, pet. denied). Moreover, just as speculative allegations concerning potential conflicts are insufficient to show that the trial court abused its discretion in finding the representatives to be adequate, *Employers Cas.*, 886 S.W.2d at 476, we conclude that allegations derived from an incorrect analysis of the law are similarly insufficient to demonstrate a conflict or abuse of discretion.

Class counsel must possess the qualifications and experience to handle the class action litigation, and must fairly and adequately protect the interests of the class. *Leonard*, 125 S.W.3d at 68. Their individual interests must not be antagonistic to the members of the subclasses which they represent. *Id.* However, class counsel owes no duty to promote a position inconsistent with the definition of the class or contrary to the law. Logically, there is no breach of the fiduciary duty by class counsel where no duty is owed to act in the manner as contended and, indeed, where to so act would result in a breach of fiduciary duty.

Similarly, fee forfeiture or disgorgement is appropriate only where there is a breach of duty. "The remedy of fee forfeiture presupposes that a lawyer's clear and serious violation of a duty to a client destroys or severely impairs the client-lawyer relationship and thereby the justification of the lawyer's claim to compensation." *Burrow v. Arce*, 997 S.W.2d 229, 238 (Tex.1999). While a client need not prove actual damages in order to obtain forfeiture of an attorney fee for the attorney's breach of a fiduciary duty to the client, the remedy is restricted to "clear and serious" violations of duty. *Id.* at 240.

The trial court below conducted an extensive hearing addressing the appropriateness of class counsel's representations, its ability to adequately represent all components of the class, the appropriateness of the settlement, and of the fees awarded to class counsel. It then conducted an extensive hearing addressing the concerns of appellants, including those related to class counsel. The trial court found no breach of duty, and no reason to change its designation of class counsel or its fee award. We find no abuse of discretion by the trial court. Appellants' fourth and fifth issues are overruled.

## IV. Conclusion

We affirm the findings and the judgment of the trial court.