COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-07-317-CV

 

 

 

AVERY
PHARMACEUTICALS, INC.            APPELLANTS/CROSS-APPELLEES

AND AL SANKARY

 

                                                   V.

 

HAYNES AND
BOONE, L.L.P.,                   APPELLEES/CROSS-APPELLANTS

CRAIG PRICE, JOHN BUTLER

EATON, AND BILL NAIFEH

 

                                              ------------

 

            FROM THE 96TH
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

                                          I.  INTRODUCTION








Appellants and Cross-Appellees Avery
Pharmaceuticals, Inc. and Al Sankary (collectively AAppellants@) appeal
from the trial court=s order granting summary
judgment in favor of Appellees and Cross-Appellants Haynes and Boone, L.L.P.,
Craig Price, John Butler Eaton, and Bill Naifeh (collectively AAppellees@).  In seven issues, Appellants argue that the
trial court erred by granting Appellees= motion
for summary judgment, by overruling Appellants=
objections to Appellees= summary judgment evidence, and
by denying Appellants= motion for new trial.  In a single cross-issue, Appellees argue that
the trial court should have granted Appellees= plea to
the jurisdiction.  We will affirm.

                          II.  FACTUAL AND PROCEDURAL BACKGROUND








John Ver Vynck, a former employee of Respiratory
Druggist, Inc. (ARDI@), an
Alabama business, approached Sankary in 2000 with a business plan to develop
AveryCa
business designed to be a wholesale distributor of generic pharmaceuticals,
including respiratory medications and plastic vials.  Ver Vynck and Sankary subsequently entered
into a business relationship together, Avery=s
articles of incorporation were filed in July 2000, and Sankary made an initial
capital investment in Avery of approximately $300,000.  Ver Vynck and Sankary each owned 50% of
Avery;[2]
Ver Vynck, Sankary, and Herman initially served as Avery=s directors;[3]
Ver Vynck was Avery=s president; and Sankary was
Avery=s chief
executive officer.

Ver Vynck was the Akey man@ at
Avery due to his pharmaceutical experience, but Sankary played a substantial
role in the day-to-day decision making process at Avery, according to Ver Vynck
and Mark Acker, a former Avery employee. 
At any given time, Avery employed between twenty to twenty-two
employees.  Avery conducted business out
of a building in Euless owned by Sankary before moving to a location in Fort
Worth in late 2002.








Haynes and Boone represented Avery and Ver Vynck,
individually, on a number of different matters. 
According to Price and Eaton, Haynes and Boone attorneys, Haynes and
Boone was not general or corporate counsel for either Ver Vynck or Avery, and
Haynes and Boone did not provide day-to-day legal counsel to Ver Vynck or
Avery; Ver Vynck and Avery engaged Haynes and Boone on a Aproject-based
basis.@  For instance, according to Eaton, he Areviewed
and revised an independent contractor agreement for Avery on March 30, 2001,
and April 1, 2001@; in July 2001, at Ver Vynck=s
request, he Aprepared a shell document for a
stock purchase agreement between Ver Vynck and [Sankary] where Ver Vynck would
purchase Sankary=s Avery stock@; and in
November 2001, at Ver Vynck=s
request, he Arevised the draft stock purchase
agreement by removing certain provisions and forwarded it to Ver Vynck.@[4]

In December 2001, at Ver Vynck=s
request, Eaton prepared a promissory note and security agreement between Avery
and Sankary regarding a loan by Sankary to Avery.  Pursuant to the note, Avery promised to pay
Sankary $393,039.00.  The security
agreement gave Sankary a security interest in various types of Avery
collateral.








At some point after Avery=s
formation, RDI initiated litigation in Alabama against Ver Vynck, Acker, and
Tim Fickling (a former Avery employee) complaining of alleged violations of
noncompete agreements with RDI.  Yancey
Burnett represented Ver Vynck in the Alabama litigation, but according to
Appellees, Haynes and Boone also provided advice to Ver Vynck and Avery about
the matter until January 2, 2001.[5]  Following a trial, the Alabama circuit judge
signed an AOrder Granting Relief Pursuant
to Breach of Employment Agreements@ on
February 20, 2002, that enjoined Ver Vynck from certain conductCincluding
competing with RDICfor eighteen months.[6]

After entry of the Alabama injunction, Ver Vynck
sought advice from Haynes and Boone regarding his compliance with the enjoining
order and the order=s effect on Avery.  In an effort to comply with the order, Ver
Vynck sold his shares in Avery to Fickling effective March 19, 2002.  Eaton prepared Ashell
document[s]@ for a Stock Purchase Agreement
and an Option Agreement (in which Fickling granted Ver Vynck the option to
purchase back the Avery shares at a later date)[7]
for Ver Vynck and Fickling to carry out the transaction.[8]








It was also (somehow) determined that Ver Vynck
could sell veterinarian products (not respiratory drugs) to veterinarian
clinics and wholesalers yet still comply with the Alabama order enjoining him
from competing with RDI.  To this end,
Haynes and Boone formed Avery Wholesale Pharmaceuticals, Inc. (AAWP@).[9]  Ver Vynck was AWP=s sole
shareholder and director.  AWP was not a
subsidiary or division of Avery.








Another business that Haynes and Boone formed at
Ver Vynck=s request was Infinity Custom
Plastics, Inc. (AInfinity@).  Avery purchased plastic vials (about two
million per month) from a Florida company and used the vials to package
medication.  According to Ver Vynck, he
and Sankary decided that they should develop their own medication vial
product.  Consequently, they conceived
Infinity Ato purchase these containers
from the manufacturer and sell them back to Avery.@  Ver Vynck was Infinity=s sole
shareholder and director. Sankary, however, chose to be a capital investor in
Infinity, not a shareholder, according to Ver Vynck.[10]  Letson opined that he was the individual
responsible for developing the vial to implement the Avery/Infinity plan and
that he developed such a vial.

In August 2002, Letson and Ver Vynck, on behalf
of Infinity, met with Naifeh, another Haynes and Boone attorney, to consult
regarding the application for a patent of the newly developed vial and process
for filling and sealing the vial.[11]  According to Naifeh, AIt was
confirmed at the meeting that [Infinity] would own all patents related to the
vial and the process.@ 
Haynes and Boone filed a provisional patent application for the vial on
or about November 20, 2002, and the vial technology was assigned to
Infinity.  At Ver Vynck=s
request, Haynes and Boone also prepared a Contract Supply Agreement (ACSA@)
between Avery and Infinity effective January 1, 2003, in which Infinity agreed
to sell and Avery agreed to purchase vials.[12]








In March 2003, Ver Vynck and Sankary signed a
letter addressed to Standard Management Corporation (AStandard@)
detailing the terms by which Avery would sell its stock to Standard.[13]  But a sale of Avery to Standard never
happened.

Ultimately, the Avery vial was never manufactured
in commercially feasible numbers, Infinity never sold any vialsCincluding
to Avery, Avery never paid any money to Infinity, and Infinity never sold any
products.  The United States Patent and
Trademark Office also rejected the patent application for the Avery vial.








In April 2003, Sankary sued Ver Vynck and Avery
to recover money owed under the promissory note that Avery executed in favor of
Sankary in December 2001.[14]  In May 2003, Sankary, Ver Vynck, and the
other defendants reached a settlement agreement.  The settlement agreement provided in part
that the parties Aagree to the sale of the assets
of Avery, [Infinity], and [AWP] to Drugmax, Inc. . . . on the terms set forth
in the Asset Purchase Agreement (AAPA@).@  Consistent with this term, Avery, AWP, and
Infinity sold all of their assets to Discount Rx, Inc. pursuant to the APA on
May 14, 2003.[15]  Sankary remains Avery=s sole
director and shareholder, and he claims to hold shrareholder=s and
director=s
meetings, but Avery has no employees, no business location, and no assets.








Appellants sued Appellees in March 2004.  Appellants= seventh
amended original petition asserted claims against Appellees for legal
malpractice, breach of fiduciary duty, fraud, negligent misrepresentation, and
conspiracy to defraud.[16]  Appellees moved for summary judgment on
Appellants= claims on no evidence and
traditional grounds and filed a plea to the jurisdiction challenging Appellants= standing.  The trial court signed an order granting
summary judgment to Appellees on June 18, 2007; the trial court did not rule on
Appellees= plea to the jurisdiction.[17]

                                     III.  SUMMARY JUDGMENT

Appellants argue in their first, second, third,
fourth, and fifth issues that the trial court erred by granting Appellees= motion
for summary judgment.  In their sixth
issue, Appellants argue that the trial court erred by denying their objections
to part of Appellees= summary judgment evidence.

A.     Standard of Review








After an adequate time for discovery, the party
without the burden of proof may, without presenting evidence, move for summary
judgment on the ground that there is no evidence to support an essential
element of the nonmovant=s claim or defense.  Tex. R. Civ. P. 166a(i).  The motion must specifically state the
elements for which there is no evidence. 
Id.; Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d
193, 207 (Tex. 2002).  The trial court
must grant the motion unless the nonmovant produces summary judgment evidence
that raises a genuine issue of material fact. 
See Tex. R. Civ. P. 166a(i) & cmt.; Sw. Elec. Power Co. v.
Grant, 73 S.W.3d 211, 215 (Tex. 2002).

When reviewing a no-evidence summary judgment, we
examine the entire record in the light most favorable to the nonmovant,
indulging every reasonable inference and resolving any doubts against the
motion.  Sudan v. Sudan, 199
S.W.3d 291, 292 (Tex. 2006).  If the
nonmovant brings forward more than a scintilla of probative evidence that raises
a genuine issue of material fact, then a no-evidence summary judgment is not
proper.  Moore v. K Mart Corp.,
981 S.W.2d 266, 269 (Tex. App.CSan
Antonio 1998, pet. denied).  We review a
no‑evidence summary judgment for evidence that would enable reasonable
and fair‑minded jurors to differ in their conclusions.  Hamilton v. Wilson, 249 S.W.3d 425,
426 (Tex. 2008) (citing City of Keller v. Wilson, 168 S.W.3d 802, 822
(Tex. 2005)).








When a trial court=s order
granting summary judgment does not specify the ground or grounds relied on for
its ruling, summary judgment will be affirmed on appeal if any of the theories
presented to the trial court and preserved for appellate review are
meritorious.  Provident Life &
Accident Ins. Co. v. Knott, 128 S.W.3d 211, 216 (Tex. 2003); Star-Telegram,
Inc. v. Doe, 915 S.W.2d 471, 473 (Tex. 1995).[18]

B.     Sankary=s Legal
Malpractice and Breach of Fiduciary Duty Claims

1.     Malpractice

In their third issue, Appellants challenge the
trial court=s grant of summary judgment in
favor of Appellees on the ground that Sankary was not a client of
Appellees.  Appellees claimed in their
no-evidence motion for summary judgment that there is no evidence Sankary was
ever their client and that they never owed Sankary any duty.








Legal malpractice is a tort cause of action based
on negligence.  Belt v. Oppenheimer,
Blend, Harrison & Tate, Inc., 192 S.W.3d 780, 783 (Tex. 2006).  To prevail on a legal malpractice claim, a
plaintiff must show that (1) the attorney owed the plaintiff a duty, (2) the
attorney breached that duty, (3) the breach proximately caused the plaintiff=s
injuries, and (4) damages occurred.  Alexander
v. Turtur & Assocs., Inc., 146 S.W.3d 113, 117 (Tex. 2004); Grider
v. Mike O=Brien, P.C., 260
S.W.3d 49, 55 (Tex. App.CHouston [1st Dist.] 2008, pet.
denied).  At common law, the rule of
privity limits an attorney=s
liability to those in privity with the attorney.  McCamish, Martin, Brown & Loeffler v.
F.E. Appling Interests, 991 S.W.2d 787, 792 (Tex. 1999).  An attorney in Texas is therefore not liable
for malpractice to anyone other than his client.  Id.; see also Barcelo v. Elliott,
923 S.W.2d 575, 577 (Tex. 1996); Stancu v. Stalcup, 127 S.W.3d 429, 432
(Tex. App.CDallas 2004, no pet.); Gamboa
v. Shaw, 956 S.W.2d 662, 664 (Tex. App.CSan
Antonio 1997, no writ); Stonewall Surplus Lines Ins. Co. v. Drabek, 835
S.W.2d 708, 710 (Tex. App.CCorpus
Christi 1992, writ denied) (AIt is
well settled that persons outside the attorney-client relationship do not have
a cause of action for injuries they might sustain due to the attorney=s
failure to perform or his negligent performance of a duty owed to his client.@).








The attorney-client relationship is a contractual
relationship whereby an attorney agrees to render professional services for a
client.  Tanox, Inc. v. Akin, Gump,
Strauss, Hauer & Feld, L.L.P., 105 S.W.3d 244, 254 (Tex. App.CHouston
[14th Dist.] 2003, pet. denied).  The
relationship can be created by an express contract or it can be implied from
the actions of the parties.  Id.; Honeycutt
v. Billingsley, 992 S.W.2d 570, 581 (Tex. App.CHouston
[1st Dist.] 1999, pet. denied).[19]  In determining whether a contractual
relationship can be implied, we use an objective standard, looking at what the
parties said and did, and we do not consider their unstated, subjective
beliefs.  Tanox, Inc., 105 S.W.3d
at 254; Roberts v. Healey, 991 S.W.2d 873, 880 (Tex. App.CHouston
[14th Dist.] 1999, pet. denied).








Difficulties in determining the existence of an
attorney-client relationship can often occur when a lawyer represents a small
entity with Aextensive common ownership and
management.@ 
MacFarlane v. Nelson, No. 03-04-00488-CV, 2005 WL 2240949, at *4
(Tex. App.CAustin Sept. 15, 2005, pet.
denied) (mem. op.) (citing Restatement (Third) of the Law Governing Lawyers ' 14
cmt. f (2000)).  Generally, however,
rendering legal services to a corporation does not, by itself, create privity
between the attorney and the corporation=s
investors, its officers and directors, and its shareholders.  Goeth v. Craig, Terrill & Hale, L.L.P.,
No. 03-03-00125-CV, 2005 WL 850349, at *6 (Tex. App.CAustin
Apr. 14, 2005, no pet.) (mem. op.); see also Gamboa, 956 S.W.2d at 664
(holding that purported shareholder was not in privity with attorney who
represented corporation and thus could not maintain legal malpractice claim
based on attorney=s representation of
corporation).  This is because a
corporation is a legal entity separate and apart from the persons who compose
it, and a cause of action against one who has injured the corporation belongs
to the corporation and not to the shareholders. 
Walker v. Anderson, 232 S.W.3d 899, 918 (Tex. App.CDallas
2007, no pet.); Hajdik v. Wingate, 753 S.W.2d 199, 201 (Tex. App.CHouston
[1st Dist.] 1988), aff=d, 795
S.W.2d 717 (Tex. 1990).

In the present case, Sankary argues that the
evidence is such that he Acould have reasonably concluded
that [Appellees] represented his interests along with those of Avery.@  Relying on deposition testimony and
affidavits, he thus contends that an attorney-client relationship between he
and Appellees could be implied from the parties=
conduct.  See Tanox, Inc., 105
S.W.3d at 254.

Sankary testified in his deposition that Haynes
and Boone represented him in connection with the preparation of the December
31, 2001 promissory note made payable to him by Avery.  He testified as follows:

[Appellees= attorney]:  You were represented by Haynes and Boone in
connection with your securing a note from Avery Pharmaceutical, correct?

 








[Sankary]:  Evidently, yeah.  They drew it up.  And evidently if they worked for the - - if
they worked for Avery, they were working for me.

 

Sankary similarly opined that Haynes and Boone represented him in
connection with the preparation of the December 31, 2001 security agreement
that gave him a security interest in Avery collateral.  But Sankary=s
subjective belief that Haynes and Boone represented him simply because it
drafted the note and security agreement on behalf of Avery is insufficient to
raise a fact issue that Haynes and Boone also owed him any duty of care because
Haynes and Boone=s representation of Avery (the
rendering of legal services to a corporation) did not, by itself, create
privity with Sankary.  See Goeth,
2005 WL 850349, at *6; see also Tanox, Inc., 105 S.W.3d at 254; Gamboa,
956 S.W.2d at 664.  Sankary points to no
other evidence objectively demonstrating that Haynes and Boone represented him
individually with regard to the preparation of the Avery promissory note and
security agreement.








Sankary further opined that Haynes and Boone
represented him in connection with its preparation of a promissory note made
payable to him by A&R and a security agreement with A&R.  He also stated in his affidavit that Haynes
and Boone Arepresented [Avery] and the
officers, directors[,] and shareholders of [Avery] beginning in 2001@ and
that A[a]lthough
I may have had more than one attorney at times, I still considered [Haynes and
Boon] to represent the interests of [Avery] and myself from 2001 into 2003.@  But Sankary directs us to no summary judgment
evidence objectively demonstrating that Haynes and Boone represented him
individually in regard to the A&R note and security agreement, nor does he
point to evidence supporting the contentions set forth in his affidavit, which
conflict with well-established caselaw.  See
Walker, 232 S.W.3d at 918; Tanox, Inc., 105 S.W.3d at 254; Goeth,
2005 WL 850349, at *6.

Sankary also included in his summary judgment
evidence the affidavit of James McCormick. 
In the affidavit, McCormick detailed the Afacts
and issues@ that he considered in arriving
at his opinions, and he opined that Sankary had an attorney-client relationship
with Appellees.  With a few exceptions,
the Afacts
and issues@ relied upon by McCormick in
arriving at his opinion consist of many of the same facts detailed in the ABackground@ section
above.  These facts, and those relied
upon by McCormick, do not demonstrate that Appellees had an attorney-client
relationship with Sankary.  They instead
show the existence of an attorney-client relationship with Ver Vynck, Avery, or
both.[20]








Examining the entire record in the light most
favorable to Sankary and indulging every reasonable inference and resolving any
doubts against the motion, Sankary failed to produce summary judgment evidence
raising a genuine issue of material fact that Appellees owed him a duty of care
as a result of an attorney-client relationship. 
See Tex. R. Civ. P. 166a(i); F.E. Appling Interests, 991
S.W.2d at 792 (holding that privity limits an attorney=s
liability to those in privity with the attorney); see also Estate of
Bradburn v. Sawko, No. 02-02-00192-CV, 2003 WL 21359514, at *3 (Tex. App.CFort
Worth June 12, 2003, no pet.) (mem. op.) (affirming grant of no-evidence motion
for summary judgment on legal malpractice claim).  Accordingly, we hold that the trial court did
not err by granting summary judgment in favor of Appellees on Sankary=s legal
malpractice claim.  We overrule
Appellants= third issue.

2.     Breach of Fiduciary Duty

In part of their fifth issue, Appellants
challenge the trial court=s grant of summary judgment in
favor of Appellees on the breach of fiduciary duty claims.








To recover on a breach of fiduciary duty claim, a
plaintiff must first show that the defendant owed a fiduciary duty.  Abetter Trucking Co. v. Arizpe, 113
S.W.3d 503, 508 (Tex. App.CHouston
[1st Dist.] 2003, no pet.) (listing elements of breach of fiduciary duty claim
as existence of fiduciary duty, breach of the duty, causation, and
damages).  Fiduciary duties arise when an
attorney-client relationship is created. 
Meyer v. Cathey, 167 S.W.3d 327, 330 (Tex. 2005); Trousdale v.
Henry, 261 S.W.3d 221, 229 (Tex. App.CHouston
[14th Dist.] 2008, pet. filed) (stating that in Texas, a fiduciary relationship
exists between attorney and clients as a matter of law).








Having determined that Sankary failed to produce
summary judgment evidence demonstrating the existence of an attorney-client
relationship between he and Appellees, Appellees therefore owed Sankary no
fiduciary duties.  There being no
evidence of the existence of a fiduciary duty owed to Sankary by Appellees, we
hold that the trial court did not err by granting summary judgment in favor of
Appellees on Sankary=s breach of fiduciary duty
claim.  See Tex. R. Civ. P.
166a(i); Swank v. Cunningham, 258 S.W.3d 647, 666 (Tex. App.CEastland
2008, pet. denied) (AAn attorney-client relationship
did not exist between Beck Redden or Smyser Kaplan and AMPS.  In the absence of an attorney-client
relationship, Beck Redden and Smyser Kaplan did not owe fiduciary duties to
AMPS, and AMPS could not recover on a breach of fiduciary duty claim against
them.@).  We overrule this part of Appellants= fifth
issue.

C.     Avery=s Legal
Malpractice and Breach of Fiduciary Duty Claims

1.     Malpractice

In another part of their fifth issue, Appellants
argue that the trial court erred by granting summary judgment in favor of
Appellees on the legal malpractice claims. 
Appellees contended in their no-evidence motion for summary judgment
that Avery did not suffer any damages.

While uncertainty as to the amount of damages is
not fatal to recovery, lack of evidence or uncertainty as to the fact of
damages is.  McKnight v. Hill &
Hill Exterminators, Inc., 689 S.W.2d 206, 207 (Tex. 1985); Pace Corp. v.
Jackson, 155 Tex. 179, 190, 284 S.W.2d 340, 348 (1955).  Damages must be ascertainable in some manner
other than by mere speculation or conjecture and by reference to some fairly
definite standard, established experience, or direct inference from known
facts.  A.B.F. Freight Sys., Inc. v.
Austrian Import Serv., Inc., 798 S.W.2d 606, 615 (Tex. App.CDallas
1990, writ denied).  If damages are too
remote, too uncertain, or purely conjectural, they cannot be recovered.  Arthur Andersen & Co. v. Perry Equip.
Corp., 945 S.W.2d 812, 816 (Tex. 1997); Swank, 258 S.W.3d at 667.








The two components of proximate cause are cause
in fact and foreseeability.  Rodgers
v. Weatherspoon, 141 S.W.3d 342, 345 (Tex. App.CDallas
2004, no pet.).  Cause in fact means that
the defendant=s acts or omissions were a
substantial factor in bringing about the injury that would not otherwise have
occurred, and foreseeability of harm means that the actor could anticipate that
his actions could injure another.  Id.

Appellants included in their summary judgment
evidence a July 2003 report that Letson prepared detailing Avery=s
projected and AEstimated Sales@ of the
vial that Letson developed had Avery ultimately sold the vial.  Letson reasoned in the report that AAvery
concluded that an estimated 18,000,000 vials could be sold direct to end users
within one month@ and that AAvery
anticipated end user sales to exceed $900,000 per month.@  Considering these figures and the three-year
CSA that Infinity had with Avery, Letson testified in his deposition that Avery
suffered approximately $22.5 million in lost profits damages.








Letson=s
opinion that Avery suffered $22.5 million in lost profits damages is laced with
and reliant upon speculation and conjecture. 
In arriving at the $22.5 million figure, Letson reasoned that the vials
would be manufactured and labeled at Infinity, that Avery would distribute the
products, and that Alarge national accounts would
buy directly from Infinity.@  Letson identified five businesses (accounts)
that he thought would purchase products directly from Infinity, but he
acknowledged that only one was actually a customer of Avery.  Two other accounts Awanted a
demonstration of the equipment before commitment,@ and
there was no evidence that the two remaining accounts were Avery customers and
no evidence that the four non-Avery customers intended at any point to enter
into a business relationship with Infinity or Avery for the purpose of
purchasing vials.

The vial project also suffered from a lack of
capital.  Letson testified that the new
vial was never manufactured in commercially feasible numbers.  According to Letson, Avery had Aone
small capacity mold that would work.  We
produced samples.  We sealed vials.  We did demonstrations.@  However, A[w]ith
the mold capacity that [Avery] had, we could not supply our existing customers@ because
the company lacked the capital to fund the project.

Significantly, all of Avery=s assets
were sold to Discount Rx pursuant to the APA on May 14, 2003.  Letson testified that his damages model is
dependent on the sale of Avery=s assets
to Discount Rx not happening, and he agreed that it was the shareholders=
decision to sell the assets.








Moreover, according to Appellants= summary
judgment evidence, Discount Rx=s sales
figures for the vial that it eventually began to sell after purchasing Avery
are considerably less than Letson=s
projection that Avery would have sold approximately fifteen to eighteen million
vials to end users per month.  Letson
testified that it took Discount Rx two years to get the vial to the market
after the purchase of Avery and that according to Amarket
knowledge,@ Discount Rx has had monthly
sales in the amount of Ahalf a million to three quarters
of a million vials a month.@

Letson=s $22.5
million damages figure is based on lost profits from the sale of the vial that
he worked to develop while employed by Avery. 
Letson and Ver Vynck met with Naifeh in 2002 to consult regarding the
application for a patent of the vial. 
Appellants have offered no evidence that the patent application for the
new vial was ever approved.[21]  Avery=s
damages figure is speculative in the absence of an approved patent for the new
vial.








Appellants contend that Avery suffered damages
from Appellees= formation of AWP and
Infinity.  Appellants argue that
Appellees caused the formation of AWP to evade the RDI injunction and to
defraud Appellants and that a conflict of interest arose when Appellees formed
AWP.  Regarding Infinity, Appellants
complain that Appellees performed no conflict checks.  There is no summary judgment evidence that
Avery was damaged as a result of the formation of AWP and Infinity.

Appellants argue that Avery suffered damages from
Appellees= preparation of the Fickling
Stock Purchase Agreement and Option Agreement. They contend that Fickling was a
Astraw
man@ and
that he was never in charge of Avery, but there is no evidence that Avery was
damaged as a result of Appellees=
preparation of the Fickling documents.

Appellants contend that Avery suffered damages as
a result of Appellees= preparation of the CSA between
Avery and Infinity.  Sankary agreed in
his deposition, however, that not a single product was sold under the CSA nor
had Avery ever paid a single dime to Infinity. 
Consequently, there is no evidence that Avery was damaged as a result of
Appellees= preparation of the CSA.

Appellants argue that Avery suffered damages as a
result of Appellees= preparation of the vial
assignment documents and the provisional patent application.  As detailed above, however, Appellants
produced no evidence that the application for the patent has been approved, and
Appellants= evidence of Letson=s
opinion regarding lost profits damages is speculative.








Appellants further argue that Avery suffered
damages as a result of Appellees=
fraudulent or negligent negotiations with Standard.  They contend that Appellees did not timely
communicate an offer by Standard to purchase Avery, and they submitted an email
from Price in which Price indicated a desire to set up a conference call
between Avery, Sankary, and their counsel to discuss the sale.  This email alone, however, is no evidence
that Appellees= alleged untimely communication
of the Standard offer caused Standard not to purchase Avery, nor does the
extent of Appellants= summary judgment evidence
indicate as much either.

Avery=s
evidence of damages is simply too remote, too uncertain, or purely conjectural,
such that the damages cannot be recovered as a matter of law.  See Arthur Andersen & Co., 945
S.W.2d at 816.  Examining the entire
record in the light most favorable to Avery and indulging every reasonable
inference and resolving any doubts against Appellees= motion
for summary judgment, we hold that Avery failed to produce summary judgment
evidence raising a genuine issue of material fact that it suffered damages
resulting from Appellees= complained-of conduct or that
Appellees= complained-of conduct
proximately caused Avery damages.  See
Tex. R. Civ. P. 166a(i). 
Accordingly, we overrule this part of Appellants= fifth
issue.

2.     Breach of Fiduciary Duty

In another part of their fifth issue, Appellants
challenge the trial court=s grant of summary judgment in
favor Appellees on Avery=s breach of fiduciary duty
claim.








The essence of a claim for breach of fiduciary
duty focuses on whether an attorney obtained an improper benefit from
representing the client.  McGuire,
Craddock, Strother & Hale, P.C., v. Transcontinental Realty Investors, Inc.,
251 S.W.3d 890, 894 (Tex. App.CDallas
2008, pet. denied); Kimleco Petroleum, Inc. v. Morrison & Shelton, 91
S.W.3d 921, 923 (Tex. App.CFort
Worth 2002, pet. denied) (stating that the focus of a breach of fiduciary duty
is whether an attorney obtained an improper benefit from representing a client
and that the essence of a breach of fiduciary duty involves the integrity and
fidelity of an attorney).  An attorney
breaches his fiduciary duty to a client when he, among other things,
subordinates his client=s interests to his own, engages
in self dealing, fails to disclose conflicts of interest, or makes
misrepresentations to achieve these ends. 
 Transcontinental Realty
Investors, Inc., 251 S.W.3d at 894. 
Fee forfeiture is appropriate only where there is a breach of a duty and
a clear and serious violation of a duty to a client that destroys or severely
impairs the attorney-client relationship. 
Bilodeau v. Webb, 170 S.W.3d 904, 916 (Tex. App.CCorpus
Christi 2005, pet. denied).








Avery generally directs us to Sankary=s
affidavit, McCormick=s affidavit, and Letson=s
affidavit as evidence that Appellees breached one or more fiduciary duties owed
to Avery.  It lists numerous acts or
omissions allegedly constituting one or more breaches of fiduciary duty,
including that Appellees breached their fiduciary duties to Avery Ain being
disloyal,@ Ain
violating firm policies designed to prevent the type of conflicts, injuries,
and damages complained of,@ Ain
favoring one client over the other,@ Ain
continuing to work against the interests of Avery and Sankary, even after
[Appellees] anticipated that they would be sued by Avery and/or Sankary,@ and Ain
violating and/or failing to comply with numerous provisions of the Texas
Disciplinary Rules of Professional Conduct.@  None of Appellants=
evidence, however, demonstrates thatCby way
of the complained of acts or omissionsCAppellees
obtained any type of improper benefit. 
There is no evidence to indicate that Appellees subordinated Avery=s
interests to their own, engaged in self dealing, failed to disclose conflicts
of interest, or made misrepresentations to achieve this end.  See Transcontinental Realty Investors,
Inc., 251 S.W.3d at 894.  Avery=s
laundry list of alleged breaches of fiduciary duty instead compromises legal
malpractice complaints that Sankary has of Appellees.  And a fee forfeiture is not appropriate under
these circumstances.  Because Appellants
failed to raise a genuine issue of material fact to show that Appellees
breached a fiduciary duty to Avery, we hold that the trial court did not err by
granting summary judgment in favor of Appellees on Avery=s breach
of fiduciary duty claim.  See Tex.
R. Civ. P. 166a(i).  We overrule this
part of Appellants= fifth issue.

D.     Avery=s and
Sankary=s Remaining Claims








In another part of their fifth issue, Appellants
argue that the trial court erred by granting summary judgment in favor of
Appellees on the fraud, fraud by nondisclosure, conspiracy to defraud, and
negligent misrepresentation claims.

1.     Fraud, Fraud by Nondisclosure, and
Conspiracy to Defraud

The elements of common law fraud are that (1) a
material misrepresentation was made; (2) the representation was false; (3) when
the representation was made, the speaker knew it was false or made it
recklessly without any knowledge of the truth and as a positive assertion; (4)
the representation was made with the intention that it be acted upon by the
other party; (5) the party acted in reliance upon the representation; and (6)
the party suffered injury.  Johnson
& Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 524
(Tex. 1998).








Fraud by nondisclosure is a subcategory of
fraud.  Schlumberger Tech. Corp. v.
Swanson, 959 S.W.2d 171, 181 (Tex. 1997). 
The elements of fraud by nondisclosure require (1) a deliberate failure
to disclose material facts, (2) by one who had a duty to disclose such facts,
(3) to another who was ignorant of the facts and did not have an equal
opportunity to discover them, (4) with the intent the listener act or refrain from
acting, and (5) the listener relies on the nondisclosure resulting in
injury.  7979 Airport Garage, L.L.C.
v. Dollar Rent A Car Sys., Inc., 245 S.W.3d 488, 507 n.27 (Tex. App.CHouston
[14th Dist.] 2007, pet. denied); see also Bradford v. Vento, 48 S.W.3d
749, 754B55 (Tex.
2001).

The elements of a conspiracy-to-defraud claim are
(1) a combination by two or more persons; (2) an object to be accomplished; (3)
a meeting of the minds on the object or course of action; (4) one or more
unlawful, overt acts; and (5) damages as the proximate result.  Massey v. Armco Steel Co., 652 S.W.2d
932, 934 (Tex. 1983); Hinojosa v. Ashcraft Law Firm, No. 11-03-00145-CV,
2004 WL 1960217, at *3 (Tex. App.CEastland
Sept. 2, 2004, pet. denied) (mem. op.); see also Schlumberger Well Surveying
Corp. v. Nortex Oil & Gas Corp., 435 S.W.2d 854, 857 (Tex. 1969)
(including requirements that persons undertake an intentional, concerted action
to defraud).  Civil conspiracy is a
derivative tort; that is, a defendant=s
liability for conspiracy depends on participation in some underlying tort for
which the plaintiff seeks to hold at least one of the named defendants
liable.  Tilton v. Marshall, 925
S.W.2d 672, 681 (Tex. 1996).  Recovery is
not based on the conspiracy; it is based on an underlying tort.  Lesikar v. Rappeport, 33 S.W.3d 282,
301B02 (Tex.
App.CTexarkana
2000, pet. denied).

Appellants point to the following statements in
their brief as evidence of Appellees= alleged
fraud, fraud by nondisclosure, and conspiracy to defraud:








$failing to make a full
disclosure to Appellants of material facts affecting Appellees= representation;

 

$suppressing facts;

$failing to provide informed
disclosure;

$failing to obtain informed
consent;

$continuing to represent
Ver Vynck, AWP, and Infinity with interests adverse to Appellants;

 

$failing to inform
Appellants that Ver Vynck owned a part of or all of Avery and any business that
competed with RDI;

 

$hiding the RDI injunction from
Appellents;

$creating AWP and Infinity for
Ver Vynck to compete with Avery;

$failing to take steps to
prevent third party Ver Vynck from accessing Avery=s funds or property in
evading the RDI injunction;

 

$attempting to cover up Appellees=
misconduct;

$failing to keep
Appellants adequately informed regarding negotiations with attempted purchase
by Standard, including preventing the sale to Standard and making
misrepresentations to Standard;

 

$delaying in the
disclosure of information which prevented the sale of Avery to Standard;

 

$concealing or otherwise
impairing the Averity,@ legibility, or
availability of the RDI injunction, the Stock Purchase Agreement and an Option
Agreement with Fickling, corporate documents for Infinity and AWP, the CSA, the
assignment of the Avery vial patent, and the acquisition of documents for
Standard=s potential purchase of
Avery; and 

 








$not disclosing the
existence, nature, implications, and possible adverse consequences of the
Fickling Stock Purchase Agreement and Option Agreement, the formation and
significance of AWP and Infinity, the CSA, and the ongoing representation of
Ver Vynck and Ver Vynck=s interests contrary to
Appellants= interests.

 

Considering the above statements and the extent
of Appellants= summary judgment evidence,
there is no evidence raising a genuine issue of material fact that Appellees
made to Appellants a material, false representation that was known to be false
or that was made recklessly and without any knowledge of the truth.  See Johnson & Higgins of Tex., Inc.,
962 S.W.2d at 524.  Because Appellants
failed to raise a genuine issue of material fact on one or more challenged
fraud elements, we hold that the trial court did not err by granting summary
judgment in favor of Appellees on Appellants= fraud
claims.  See Tex. R. Civ. P.
166a(i).  We overrule this part of
Appellants= fifth issue.








Appellants direct us to evidence apparently
demonstrating that Appellees failed to disclose various facts, but there is no
summary judgment evidence that Appellees deliberately failed to disclose
the material facts with the intent that Appellants act or refrain from
acting based on the nondisclosed information. 
See 7979 Airport Garage, L.L.C., 245 S.W.3d at 507 n.27.  Because Appellants failed to raise a genuine
issue of material fact on one or more challenged fraud by nondisclosure
elements, we hold that the trial court did not err by granting summary judgment
in favor of Appellees on Appellants= fraud
by nondisclosure claims.  See  Tex. R. Civ. P. 166a(i).  We overrule this part of Appellants= fifth
issue.

Because there is no genuine issue of material
fact on Appellants= tort claims, there is no
genuine issue of material fact supporting Appellants=
derivative conspiracy to defraud claim.  See
Tilton, 925 S.W.2d at 681; Lesikar, 33 S.W.3d at 301B02.[22]  Because Appellants failed to raise a genuine
issue of material fact on one or more challenged conspiracy to defraud
elements, we hold that the trial court did not err by granting summary judgment
in favor of Appellees on Appellants=
conspiracy to defraud claims.  See Tex.
R. Civ. P. 166a(i).  We overrule this
part of Appellants= fifth issue.

2.     Negligent Misrepresentation








An attorney can be subject to a negligent
misrepresentation claim in a case in which he is not subject to a legal
malpractice claim.  F.E. Appling
Interests, 991 S.W.2d at 792.  Under
the tort of negligent misrepresentation, liability is not based on the breach
of duty a professional owes his or her clients or others in privity, but on an
independent duty owed to the nonclient based on the professional=s
manifest awareness of the nonclient=s
reliance on the misrepresentation and the professional=s
intention that the nonclient so rely.  Id.  Thus, the elements of a negligent
misrepresentation claim are (1) the representation is made by a defendant in
the course of his business or in a transaction in which he has a pecuniary
interest, (2) the defendant supplies false information for the guidance of others
in their business, (3) the defendant did not exercise reasonable care or
competence in obtaining or communicating the information, and (4) the plaintiff
suffers pecuniary loss by justifiably relying on the representation.  Fed. Land Bank Ass=n of
Tyler v. Sloane, 825 S.W.2d 439, 442 (Tex. 1991); Grand
Champion Film Prod., L.L.C. v. Cinemark USA, Inc., 257 S.W.3d 478, 485
(Tex. App.CDallas 2008, no pet.).  For a negligent misrepresentation, reliance
must be justifiable.  Ernst &
Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001).








Appellants do not include a single record
citation in their opening brief directing us to evidence that they claim raises
a genuine issue of material fact to support their negligent misrepresentation
claim.  See Tex. R. App. P.
38.1(h) (requiring that briefs contain a clear and concise argument for the
contentions made with appropriate citations to authorities and to the
record).  Nonetheless, considering all of
the evidence submitted by Appellants in their response to Appellees= motion
for summary judgment, including the evidence detailed in the bullet points
immediately above, none of it raises a genuine issue of material fact that
Appellees supplied Appellants with false information that Appellants
consequently justifiably relied on.  See
Sloane, 825 S.W.2d at 442. 
Appellants= claims are instead mostly based
upon Appellees= alleged failures to disclose
information related to matters associated with Appellees=
rendering of services for Ver Vynck, Avery, AWP, or Infinity.  Because Appellants failed to raise a genuine
issue of material fact on one or more challenged negligent misrepresentation
elements, we hold that the trial court did not err by granting summary judgment
in favor of Appellees on Appellants=
negligent misrepresentation claims.  See
Tex. R. Civ. P. 166a(i).  We overrule
the remainder of Appellants= fifth
issue.

E.     Audio Cassette Tape Evidence








In their sixth issue, Appellants argue that the
trial court erred and abused its discretion by overruling their objection to an
audio cassette tape that Appellees included in their summary judgment
evidence.  The tape contains a recorded
telephone conversation between Sankary and Ver Vynck.  Appellants contend that Appellees failed to
properly authenticate the tape and failed to show that the recording was
accurate and that it had no changes, deletions, or additions.  Because we affirm the trial court=s grant
of summary judgment in favor of Appellees on no-evidence grounds, we hold that
error, if any, in the trial court=s
overruling of Appellants= objection to the tape was
harmless.  We do not consider Appellees= summary
judgment evidence submitted in support of their traditional motion for summary
judgment to arrive at our holdings.  See
Tex. R. Civ. P. 166a(i); Tex. R. App. P. 44.1(a)(1).  We overrule Appellants= sixth
issue.

                                   IV.  MOTION FOR NEW TRIAL

In their seventh issue, Appellants argue that the
trial court abused its discretion by denying their motion for new trial.  They contend that they Afiled
their motion for new trial to bring the trial court=s
attention to the errors committed in granting the summary judgments.@  Because we affirm the trial court=s grant
of summary judgment in favor of Appellees on all of Appellants= claims,
we hold that the trial court did not abuse its discretion by denying Appellants= motion
for new trial.  We overrule Appellants= seventh
issue.

Because Appellants= third,
fifth, sixth, and seventh issues are dispositive, we need not consider
Appellants= first, second, and fourth
issues.  See Tex. R. App. P. 47.4.

                                   V.  PLEA TO THE JURISDICTION








In their sole cross-point, Appellees argue that
the trial court should have sustained their plea to the jurisdiction.  Because we affirm the trial court=s grant
of summary judgment in favor of Appellees on Appellants= claims,
we need not consider Appellees=
argument complaining of the trial court=s
failure to grant the plea to the jurisdiction. 
See id.  Accordingly, we
overrule Appellees= cross-point.

                                          VI.  CONCLUSION

Having overruled Appellants= third,
fifth, sixth, and seventh issues, Appellants=
dispositive issues, and having overruled Appellees=
cross-issue, we affirm the trial court=s order
granting summary judgment in favor of Appellees 
on Appellants= claims.

PER
CURIAM

 

PANEL: DIXON W. HOLMAN,
J. (Senior Justice, Retired, Sitting by Assignment); LIVINGSTON and DAUPHINOT,
JJ.

 

DELIVERED:  February 5, 2009











[1]See Tex. R. App. P. 47.4.





[2]Initially, however,
according to Ver Vynck, at the time of Avery=s formation, Ver Vynck owned 50% of Avery,
Sankary owned 24%, Steve Herman (Sankary=s nephew) owned 24%, and another individual owned
1%.





[3]Herman later sold his
shares to Sankary and left the board.





[4]According to Eaton, ANeither of these draft
agreements contained any sales price terms.@





[5]A January 2, 2001 letter
addressed to Ver Vynck from Price concerns ARespiratory Druggist, Inc., Respiratory
Distribuitors, Inc./Richard Powell@ and states that A[i]t is my understanding
that, at this time, we are not addressing any outstanding legal issues for
Avery Pharmaceuticals.@





[6]The order specifically
enjoined Ver Vynck Afrom directly or
indirectly soliciting . . . or accepting . . . any business from any of RDI=s former customers which
involves respiratory medications or unit dose vials utilized in the sale of
respiratory medications@; Afrom hiring away or
attempting to hire away . . . any RDI employee@; Afrom directly or
indirectly engaging in any business dealing in any way with the home health
care field as it relates to the purchase or sale of respiratory medication and
unit dose vials; Afrom operating as a sole
proprietor, or owning any interest in any person, firm, corporation,
partnership, or other entity engaged in the business of purchasing or selling
respiratory medications and unit dose vials and related equipment@; and Afrom directly or
indirectly owning any interest in, or becoming employed in, any entity engaged
in the business of the same or similar nature as [RDI].@





[7]According to Eaton, he Adid not negotiate any of
the terms of either agreement,@ and he Awas unaware whether the agreements were ever
executed or consummated.@





[8]The summary judgment
evidence is unclear regarding all of the details surrounding the effect, if
any, of the agreements.  Fickling
testified in his deposition that he Asigned back@ the Avery stocks to Ver Vynck at some point, but
he also agreed that he Adidn=t end up owning anything@ after signing the
agreements.  Whatever the case, Eaton
prepared the documents.





[9]Sankary opined that AWP
was formed behind his back and to circumvent the Alabama order and that
Appellees did not inform him or reveal that they were forming AWP; had they
done so, he would have objected.  Ver
Vynck and Acker, however, opined that Sankary was aware of AWP and the nature
of its business.





[10]Sankary said he had no idea
that Infinity was being formed when it happened and that Appellees did not
inform him or reveal that they were forming Infinity.  Had they done so, he would have
objected.  But Nick Letson, an Avery
salesman, reasoned that Sankary worked independently on a Avial tray,@ and Ver Vynck opined
that Sankary was involved in efforts to obtain financing for leasing
vial-sealing equipment to Infinity.





[11]The vial was designed to
be sealed using an ultrasonic sealer instead of a heat sealer.  Naifeh said that Bernard Strong, a ACalifornia plastics
inventor, came up with the specific features of the vial.@





[12]Ver Vynck opined that
Sankary was fully aware of the CSA, but Sankary claimed at his February 2005
deposition that he did not learn about it until recently.





[13]According to Sankary,
however, Haynes and Boone did not have the authority to open a file for the
sale of Avery to Standard.





[14]Sankary also sued A&R
Pharmacy, a/k/a Airway Relief Pharmacy, Inc., (AA&R@) to recover money owed
under a promissory note that A&R executed in favor of Sankary in December
2001.  A&R is yet another Ver Vynck
pharmaceutical business that Sankary invested in.





[15]Sankary also obtained a
temporary restraining order when he sued Ver Vynck and Avery in April 2003 that
enjoined Ver Vynck and the other defendants from Ataking actions that will
diminish . . . Sankary=s security interests.@  Ver Vynck reasoned that Sankary forced him to
agree to the sale of Avery=s, Infinity=s, and AWP=s assets by way of the temporary restraining
order because Ver Vynck could not Ahave an income, provide for my family.  I was basically kicked out of the company.@





[16]Appellants alleged in
part that Appellees failed to dissuade Ver Vynck from breaching duties owed to
Avery; charged or accepted payments from Avery for legal work performed for or
to benefit others; disclosed confidential or privileged information to Ver
Vynck at a time when he was enjoined from owning or operating Avery; failed to
render full and fair disclosure of facts material to Appellants= representation; failed
to adequately perform a conflicts check; and represented Appellants and Ver
Vynck, AWP, and Infinity at a time when such representation involved
substantially related matters in which Ver Vynck=s interests were
materially and directly adverse to the interests of Appellants.





[17]The trial court
originally signed an order granting Appellees= motion for summary
judgment on August 21, 2006.  Thereafter,
a visiting judge granted Appellants= motion for new trial, and Appellees filed their
second traditional and no-evidence motions for summary judgment in April 2007.





[18]Appellees also filed a
traditional motion for summary judgment on Appellants= claims.  But when a party moves for summary judgment
under both rules 166a(c) and 166a(i), we will first review the trial court=s judgment under the
standards of rule 166a(i).  Ford Motor
Co. v. Ridgway, 135 S.W.3d 598, 600 (Tex. 2004).  If the appellants failed to produce more than
a scintilla of evidence under that burden, then there is no need to analyze
whether appellee=s summary judgment proof
satisfied the less stringent rule 166a(c) burden.  Id. 
Because we affirm the trial court=s grant of summary judgment on no-evidence
grounds, we do not set forth and utilize the traditional motion for summary
judgment standard of review.





[19]For instance, the
relationship can be implied from the parties= conduct indicating the intent to enter into such
a relationship, or it can be implied from the attorney=s gratuitous rendition of
professional services.  Sotelo v.
Stewart, No. 08-06-00145-CV, 2008 WL 2174425, at *3 (Tex. App.CEl Paso May 22, 2008,
pet. filed).





[20]One of our sister courts
listed in a memorandum opinion several factors to consider in determining
whether an entity lawyer also represents an individual associated with the
entity.  Those factors include the
following:  whether the lawyer
affirmatively assumed the duty of individual representation, whether the
individual had independent representation, whether the lawyer previously
represented the individual on a personal basis, and whether the evidence
demonstrates the individual=s reliance on or expectations of the lawyer=s separate
representation.  See MacFarlane,
2005 WL 2240949, at *4.  To the extent
these factors are applicable to the analysis of whether an attorney-client
relationship existed between Sankary and Appellees, each of the factors weighs
in favor of a determination that no attorney-client relationship existed.





[21]Indeed, Appellees
supplemented their motions for summary judgment with evidence that the patent
had been rejected by the United States Patent and Trademark Office.





[22]In any event, there is
also no summary judgment evidence that Appellees had a meeting of the minds to
commit one or more unlawful, overt fraudulent acts.  See Massey, 652 S.W.2d at 934.